## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| R2 Solutions LLC,<br><br>              Plaintiff,<br><br>v.<br><br>Deezer S.A.,<br><br>              Defendant. | Civil Action No. 4:21-cv-00090-ALM<br><br>Jury Trial Demanded |
| R2 Solutions LLC,<br><br>              Plaintiff,<br><br>v.<br><br>Walmart Inc.,<br><br>              Defendant. | Civil Action No. 4:21-cv-00091-ALM<br><br>Jury Trial Demanded |
| R2 Solutions LLC,<br><br>              Plaintiff,<br><br>v.<br><br>Charles Schwab Corp.,<br><br>              Defendant. | Civil Action No. 4:21-cv-00122-ALM<br><br>Jury Trial Demanded |

R2 Solutions LLC,

                     Plaintiff,

v.

JPMorgan Chase & Co.,

                     Defendant.

Civil Action No. 4:21-cv-00174-ALM

Jury Trial Demanded

## **<u>DEFENDANTS' JOINT RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................................................... 1

II.   OVERVIEW OF PLAINTIFF'S PATENTS ............................................................. 1

III.  DISPUTED TERMS REQUIRING CONSTRUCTION .......................................... 2

    **A.    '610 Patent ........................................................................................................ 2**

        1.   "a plurality of mapping functions that are each user-configurable"
            (Claims 1, 17, 33, 40) ..................................................................................2

        2.   "the first data group is mapped differently than the data of the second
            data group" (Claims 1, 17) ..........................................................................5

        3.   "data group" (Claims 1-2, 4, 17-18, 33, 40) ...............................................7

        4.   "data partition" (Claims 1, 17, 33, 40) .......................................................9

        5.   "including processing the intermediate data for each data group in a
            manner that is defined to correspond to that data group, so as to
            result in a merging of the corresponding different intermediate data
            based on the key in common" (Claim 1) ...................................................11

        6.   "data set" (claims 1, 17, 33, 34, 40, 41) ...................................................12

        7.   "at least one output data group is a plurality of output data groups"
            (claims 2, 18) ............................................................................................15

    **B.    '157 Patent ...................................................................................................... 17**

        1.   "intents" (asserted claims 1, 2, 3) .............................................................17

        2.   "determining, at least the one computing device, a plurality of
            intents...by a user submitting the query" (claim 1) ...................................25

        3.   "wherein the at least one intent comprises an unclassified intent"
            (claim 3) ....................................................................................................30

        4.   "the query is classified by linguistic analysis of the at least one query
            keyword" (claim 5) ...................................................................................32

    **C.    '329 Patent ...................................................................................................... 36**

        1.   "abstract" (claims 4, 11) ...........................................................................36

        2.   "recall" (claims 1, 4, 8, 11) ......................................................................39

        3.   "not used" (claims 1, 4, 8, 11) .................................................................42

        4.   "section(s)" (claims 1, 4, 8, 11) ...............................................................44

        5.   "document(s)" (claims 1, 4, 5, 8, 11, 12) .................................................46

    **D.    '317 Patent ...................................................................................................... 47**

        1.   "partial query" (Claims 1, 2, 8, 12) ..........................................................47

        2.   "… not fully representative of an entire search query desired by the
            user" and "… better representative of the entire search query
            desired by the user" (Claims 1, 8) ............................................................49

        3.   "query reconstruction server … operative to receive a partial query
            submitted at a remote user client system … and … determine a full
            query" (Claims 1, 2) ..................................................................................51

## TABLE OF CONTENTS
### (Continued)

Page

E.    **'279 Patent** .................................................................................. **54**

    1.  "streaming appliance computing device" (Claims 1-3, 7) ..............54

    2.  "single-action user input" (Claims 1-3) ......................................55

F.    **'011 Patent** .................................................................................. **58**

    1.  "a link from a portal" (claim 7) / "each link from the portal" (claim 9)..........58

    2.  "a user identification" (claim 7) / "respective user identifications" (claim 9) ...................................................................................61

    3.  "associating the user identification with the portal" (claim 7) / "associating respective user identifications with the portal" (claim 9) ..........................................................................................66

G.    **Plaintiff Has Waived Its Indefiniteness Positions** ........................... **69**

IV.    CONCLUSION.......................................................................................... 72

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AGIS Software Dev. v. T-Mobile*,
   2:21-cv-72-JRG-RSP, Dkt. No. 213 (E.D. Tex. Nov. 10, 2021) ...........................................26

*Ahern Rentals, Inc. v. EquipmentShare.com, Inc*,
   No. 2:20-CV-00333-JRG, 2021 WL 4891379 (E.D. Tex. Oct. 19, 2021).......................12, 26

*Andersen Corp. v. Fiber Composites, LLC*,
   474 F.3d 1361 (Fed. Cir. 2007).....................................................................................4, 6

*In re Anderson*,
   106 F.3d 425 (Fed. Cir. 1997).............................................................................................13

*Aptustech LLC v. Trimfoot Co.*,
   4:19-CV-133-ALM, 2020 WL 772456 (E.D. Tex. Feb. 18, 2020)........................................72

*ArcherDx, Inc. v. QIAGEN Scis., LLC*,
   No. CV 18-1019 (MN), 2019 WL 6785546 (D. Del. Dec. 12, 2019)....................................39

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
   521 F.3d 1328 (Fed. Cir. 2008)............................................................................................53

*Astrazeneca AB v. Mut. Pharm.*,
   384 F.3d 1333 (Fed. Cir. 2004)......................................................................................38, 45

*Ave. Innovations, Inc. v. E. Mishan & Sons Inc.*,
   310 F. Supp. 3d 457 (S.D.N.Y. 2018)..................................................................................51

*Bancorp Servs., LLC v. Hartford Life Ins.*,
   359 F.3d 1367 (Fed. Cir. 2004)............................................................................................28

*Barkan Wireless Access Techs., L.P. v. Cellco P'ship*,
   No. 2:16-cv-293-JRG-RSP, 2017 WL 2099565 (E.D. Tex. May 14, 2017),
   *aff'd*, 748 Fed. App'x. 987 (Fed. Cir. 2018)........................................................................61

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*,
   262 F.3d 1258 (Fed. Cir. 2001)............................................................................................40

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018)............................................................................................20

*Bicon, Inc. v. Straumann Co.*,
   441 F.3d 945 (Fed. Cir. 2006)................................................................................................2

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Blue Spike v. Grande Commc'ns*,
  4:20-CV-671-ALM (E.D. Tex. Nov. 2, 2021) ........................................................................71

*Boss Control, Inc. v. Bombardier Inc.*,
  410 F.3d 1372 (Fed. Cir. 2005) ............................................................................................39

*C-Cation Techs., LLC v. Time Warner Cable, Inc.*,
  No. 2:14-cv-0059-JRG-RSP, 2015 WL 1849014 (E.D. Tex. Apr. 20, 2015) ........................68

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
  358 F.3d 1371 (Fed. Cir. 2004) ............................................................................................16

*Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc.*,
  206 F.3d 1440 (Fed. Cir. 2000) ............................................................................................62

*Constant Compliance v. Emerson*,
  598 F. Supp. 2d 842 (N.D. Ill. 2009) .............................................................................70, 72

*CXT Sys., Inc. v. Academy, Ltd.*,
  No. 2:18-cv-00171-RWS-RSP, 2019 WL 4253841 (E.D. Tex. Sept. 6, 2019) ......................53

*Cypress Lake Software Inc. v. Samsung Electronics America, Inc.*,
  382 F. Supp. 3d 586 (E.D. Tex. 2019) ..................................................................................51

*Danco, Inc. v. Fluidmaster, Inc.*,
  No 5:16-cv-73-JRG-CMC, 2017 WL 4225217 (E.D. Tex. Sept. 22, 2017) ..........................62

*Dareltech v. Samsung Elecs.*,
  4:18-cv-702-ALM (E.D. Tex. Mar. 16, 2020) ......................................................................72

*Datamize, LLC v. Plumtree Software, Inc.*,
  417 F.3d 1342 (Fed. Cir. 2005) ............................................................................................50

*Dow Chemical v. Nova Chemicals*,
  803 F.3d 620 (Fed. Cir. 2015) ........................................................................32, 33, 35, 36

*Edwards Lifesciences LLC v. Cook Inc.*,
  582 F.3d 1322 (Fed. Cir. 2009) ..................................................................37, 38, 39, 42

*Enserion, LLC v. Orthofix, Inc.*,
  4:20-CV-108-ALM (E.D. Tex. Mar. 4, 2021) ......................................................................71

*Enzo Biochem, Inc. v. Applera Corp.*,
  599 F.3d 1325 (Fed. Cir. 2010) ............................................................................................22

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Enzo Biochem, Inc. v. Gen-Probe Inc.*,
  323 F.3d 956 (Fed. Cir. 2002) ................................................................. 13

*Eon Corp. IP Holdings v. Silver Spring Networks*,
  815 F.3d 1314 (Fed. Cir. 2016) ............................................. 38, 42, 43, 45

*Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*,
  279 F.3d 1022 (Fed. Cir. 2002) ............................................................... 68

*ESIP Series 1, LLC v. Doterra Int'l, LLC*,
  No. 2:15-cv-779-RJS-DBP, 2021 WL 1516010 (D. Utah Apr. 16, 2021) ..................... 19, 20

*In re Fought*,
  941 F.3d 1175 (Fed. Cir. 2019) ............................................................... 12

*Free Stream Media Corp. v. Alphonso Inc.*,
  No. 2:15-cv-1725-RWS, 2017 WL 1165578 (E.D. Tex. Mar. 29, 2017), *aff'd*,
  2021 WL 1880931 (Fed. Cir. May 11, 2021) ............................................... 66

*In re Frey*,
  166 F.2d 572 (C.C.P.A. 1948) ................................................................ 13

*Gen. Elec. Co. v. ITC*,
  685 F.3d 1034 (Fed. Cir. 2012) ................................................................ 2

*Graham v. John Deere Co. of Kansas City*,
  383 U.S. 1 (1966) ................................................................................ 4

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
  527 F.3d 1379 (Fed. Cir. 2008) ............................................................... 39

*Icon Health & Fitness, Inc. v. Polar Electro Oy*,
  656 F. App'x 1008 (Fed. Cir. 2016) ....................................... 13, 14, 24, 25

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004) ............................................................... 59

*Intell. Ventures II LLC v. Sprint Spectrum, L.P.*,
  2019 WL 2959568 (E.D. Tex. Apr. 18, 2019), *R&R adopted*, 2019 WL
  1987204 E.D. Tex. (May 6, 2019) ....................................... 69, 70, 71, 72

*Intellectual Ventures, LLC v. T-Mobile USA, Inc. et. al*,
  902 F.3d 1372 (Fed. Cir. 2018) ............................................................... 50

*IQASR LLC v. Wendt Corp.*,
  825 F. App'x 900 (Fed. Cir. 2020) .......................................................... 22

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Lectec Corp. v. Chattem, Inc.*,
No. 5:08-cv-130-DF, 2010 WL 10861324 (E.D. Tex. May 20, 2010) ....................................59

*Maxell Ltd. v. Apple Inc.*,
No. 5:19-CV-00036-RWS, 2020 WL 10456875 (E.D. Tex. Mar. 18, 2020) ...........................7

*Merck & Co., Inc. v. Teva Pharms. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005)..............................................................................................2

*Microsoft Corp. v. i4i Ltd. P'ship*,
564 U.S. 91 (2011)...............................................................................................................71

*MicroUnity Sys. Eng'g, Inc. v. Acer, Inc.*,
No. 2:10-cv-91-LED-RSP, 2013 WL 866469 (E.D. Tex. Mar. 7, 2013) ...............................60

*Mobile Telecommunications Techs., LLC v. Leap Wireless Int'l, Inc.*,
No. 2:13-CV-885-JRG-RSP, 2015 WL 2250056 (E.D. Tex. May 13, 2015)...........................2

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014)...................................................................................................... *passim*

*Novo Indus., L.P. v. Micro Molds Corp.*,
350 F.3d 1348 (Fed. Cir. 2003)................................................................................26, 29, 30

*Novosteel SA v. U.S. Bethlehem Steel Corp.*,
284 F.3d 1261 (Fed. Cir. 2002)............................................................................................69

*Nystrom v. TREX Co.*,
424 F.3d 1136 (Fed. Cir. 2005)............................................................................................40

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)............................................................................................38

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003)............................................................................................64

*Omni MedSci, Inc. v. Apple Inc.*,
No. 2:18-CV-00429-RWS, 2019 WL 3818762 (E.D. Tex. Aug. 14, 2019) .....................16, 17

*Pactec, Inc. v. I.C.E. Packaging Co., LLC*,
2021 WL 5277131 (E.D. Tenn. Nov. 12, 2021) ....................................................................37

*Parthenon Unified Memory Architecture LLC v. Apple Inc.*,
No. 2:15-CV-00621-JRG-RSP, 2016 WL 3365945 (E.D. Tex. June 17, 2016)...............26, 28

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Personalized Media Communications, LLC v. ITC*,
    161 F.3d 696 (Fed. Cir 1998) .................................................................................. 52

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ........................................................................... 6, 13

*Rhine v. Casio, Inc.*,
    183 F.3d 1342 (Fed. Cir. 1999) ............................................................................... 15

*Saso Golf v. Nike*,
    843 Fed. App'x 291 (Fed. Cir. 2021) ........................................................... 35, 36, 69

*Scripps Rsch. Inst. v. Illumina, Inc.*,
    782 F. App'x 1018 (Fed. Cir. 2019) .................................................................. 18, 19

*Semcon IP Inc. v. Huawei Device*,
    No. 2:16-cv-437-JRG-RSP, 2017 WL 2972193 (E.D. Tex. July 12, 2017) ......... 20, 21, 36

*SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech.*,
    983 F.3d 1367 (Fed. Cir. 2021) ............................................................................... 15

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
    511 F.3d 1132 (Fed. Cir. 2007) .......................................................................... 18, 59

*Standard Oil Co. v. Am. Cyanamid Co.*,
    774 F.2d 448 (Fed. Cir. 1985) ................................................................................. 64

*Stumbo v. Eastman Outdoors, Inc.*,
    508 F.3d 1358 (Fed. Cir. 2007) ............................................................................... 13

*Synchronoss Techs., Inc. v. Dropbox, Inc.*,
    987 F.3d 1358 (Fed. Cir. 2021) ............................................................................... 16

*TF3 Ltd. v. Tre Milano, LLC*,
    894 F.3d 1366 (Fed. Cir. 2018) ..................................................................... 37, 39, 42

*TQP Dev., LLC v. Merrill Lynch & Co.*,
    No. 2:08-CV-471-WCB, 2012 WL 1940849 (E.D. Tex. May 29, 2012) .................. 6, 9, 11

*Trusted Knight Corp. v. Int'l Bus. Machines Corp.*,
    681 F. App'x 898 (Fed. Cir. 2017) ...................................................................... 25, 30

*Trustees of Columbia Univ. in City of New York v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016) ............................................................................... 16

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*TVnGO Ltd. (BVI) v. LG Elecs. Inc.*,
    861 F. App'x 453 (Fed. Cir. 2021) ................................................................13, 14, 15

*Uniloc USA, Inc. v. Samsung Elecs. Am., Inc.*,
    No. 2:18-CV-0041-JRG-RSP, 2019 WL 1614724 (E.D. Tex. Apr. 15, 2019) .................26, 28

*United Carbon Co. v. Binney & Smith Co.*,
    317 U.S. 228 (1942) ................................................................................................20

*Univ. of Texas Sys. v. BENQ Am. Corp.*,
    533 F.3d 1362 (Fed. Cir. 2008) ..............................................................................28

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007) .............................................................................6, 8

*Versata Software, Inc. v. Zoho Corp.*,
    213 F. Supp. 3d 829 (W.D. Tex. 2016) ...............................................................23, 33

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ...............................................................................45

*Wanker v. United States*,
    152 Fed. Cl. 219 (2021) ..........................................................................................15

*Wapp Tech. v. Seattle Spinco et al.*,
    4:18-cv-469-ALM (E.D. Tex. Apr. 27, 2020) .......................................................71

*Wapp Techs. v. Seattle Spinco*,
    No. 4:18-CV-469, 2020 WL 1983087 (E.D. Tex. Apr. 27, 2020) ..........................28

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) ..............................................................................52

*WMS Gaming Inc. v. Int'l Game Tech*,
    184 F.3d 1339 (Fed. Cir. 1999) ..............................................................................53

*Zadro Prod., Inc. v. SDI Techs., Inc.*,
    No. 17-1406 (WCB), 2019 WL 10252726 (D. Del. June 19, 2019) ......................22

**Statutes**

35 U.S.C. § 112 .............................................................................................................16

35 U.S.C. § 112(2) ...................................................................................................50, 71

35 U.S.C. §112(6) ....................................................................................................52, 53

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

**Other Authorities**

Local Rule CV-7(d) ..................................................................................................69

Microsoft Computer Dictionary...............................................................................55

Local Patent Rule 4-3................................................................................................69

Local Patent Rule 4-5(a)-(c) ....................................................................................70

**TABLE OF EXHIBITS**

| No. | Description |
|:---:|:---|
| 1 | '610 Patent Final Office Action |
| 2 | '610 Patent Amendment After Final Office Action |
| 3 | '157 Patent, 5-18-2012 Amended Claims |
| 4 | '157 Patent, 12-23-2011 Amended Claims |
| 5 | Al-Otaiby et al. (2005) |
| 6 | Panckhurst (2006) |
| 7 | Peng (2005) |
| 8 | Jensen et al. (2007) |
| 9 | Pauw (2006) |
| 10 | Leveling (2006) |
| 11 | Bitton et al. (2006) |
| 12 | Neri et al. (2005) |
| 13 | Pazienzia (2005) |
| 14 | Phillips Streamium |
| 15 | MusicMatch |
| 16 | Dictionary Definition - Appliance |
| 17 | '011 Patent Office Action Response |
| 18 | '011 Patent Issue Classification |

## I.      INTRODUCTION

Defendants Deezer S.A. ("Deezer"), Walmart Inc. ("Walmart"), The Charles Schwab Corp. ("Schwab"), and JPMorgan Chase & Co. ("JPMorgan") (collectively, "Defendants") submit this Responsive Claim Construction Brief in Response to Plaintiff R2 Solutions LLC's ("Plaintiff") Opening Claim Construction Brief ("Br.")[1].

The terms requiring construction are from six asserted patents:  U.S. Patent No. 8,190,610 ("the '610 Patent"), U.S. Patent No. 8,341,157 ("the '157 Patent"), U.S. Patent No. 7,698,329 ("the '329 Patent"), U.S. Patent No. 8,209,317 ("the '317 Patent"), U.S. Patent No. 9,928,279 ("the '279 Patent"), and U.S. Patent No. 7,370,011 ("the '011 Patent") (collectively, "Asserted Patents").  The patents asserted against each Defendant are shown in the table below:

| Case | '610 Patent | '157 Patent | '329 Patent | '317 Patent | '279 Patent | '011 Patent |
|---|---|---|---|---|---|---|
| *R2 Solutions LLC v. Deezer SA*, 4:21-cv-00090 | X | X | X | X | X | |
| *R2 Solutions LLC v. Walmart Inc.*, 4:21-cv-00091 | X | X | X | | | |
| *R2 Solutions LLC v. The Charles Schwab Corporation*, 4:21-cv-00122 | X | | | | | X |
| *R2 Solutions LLC v. JPMorgan Chase & Co.*, 4:21-cv-00174 | X | | | | | X |

## II.     OVERVIEW OF PLAINTIFF'S PATENTS

Defendants' submitted a technology synopsis to the Court on November 12, 2021. Defendants' technology synopsis is incorporated herein by reference.

---

[1] Dkt. 36 in Case No. 4:21-cv-00090; Dkt. 43 in 4:21-cv-00091; Dkt. 33 in Case No. 4:21-cv-00122; and Dkt. 29 in Case No. 4:21-cv-00174.

### III.    DISPUTED TERMS REQUIRING CONSTRUCTION

A.    '610 Patent[2]

1.    *"a plurality of mapping functions that are each user-configurable"* *(Claims 1, 17, 33, 40)*

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning. | "two or more mapping functions that are individually configurable by a user" |

The dispute with respect to this term centers on whether "each user-configurable" requires that each of the plurality of mapping functions be individually configurable—as is reflected in Defendants' proposed construction—or merely that the plurality of mapping functions be configurable, either as a group or individually—as Plaintiff contends.  Although Plaintiff advocates for plain and ordinary meaning, its arguments demonstrate that the meaning it ascribes to this term would effectively read the word "each" out of the claims.  Plaintiff's attempt to do so is improper for a number of reasons.

First, the Federal Circuit has repeatedly held that claims must be "interpreted with an eye toward giving effect to all terms in the claim." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006).[3]  Plaintiff's resistance to the word "individually" in Defendants' construction rests on its contention that the specification does not "require that each mapping function be 'individually configurable,' as opposed to just 'user-configurable.'"  *See* Br. at 19.  As discussed further below, this statement is not accurate, but even if it were, this argument fails because a patent's specification may not be used to broaden the express claim language chosen by the applicant.  *See, e.g.*, *Gen. Elec. Co. v. ITC*, 685 F.3d 1034, 1041 (Fed. Cir. 2012) ("[A] possibly

---

[2] Plaintiff asserts this patent against all four Defendants.
[3] *See also Mobile Telecommunications Techs., LLC v. Leap Wireless Int'l, Inc.*, No. 2:13-CV-885-JRG-RSP, 2015 WL 2250056, at *7 (E.D. Tex. May 13, 2015) (*quoting Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005)) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

broader disclosure accompanied by an explicit narrow claim shows the inventor's selection of the narrow claim scope."). Here, the claim language on its face requires that the mapping functions are "***each*** user-configurable." '610 Patent at Claim 1.

In addition, other claim language provides context that demonstrates that the claims require that the mapping functions be individually configurable. Specifically, the claims recite that "the data of the first data group is ***mapped differently*** than the data of the second data group so that ***different lists of values are output*** for the corresponding different intermediate data." *See* '610 Patent at Claim 1 (emphasis added). This claim language indicates that the map functions differ based on the data group and those differences stem from the fact that ***each*** map function is individually user-configurable. Because Plaintiff's "plain and ordinary meaning" fails to give effect to all terms of the claims, it should be rejected.

Second, the "each user-configurable" language was added to the claims during prosecution to differentiate them from, and gain allowance over, prior art cited by the examiner. The claims were rejected over the prior art Cruanes reference, which the Examiner said disclosed "for the data of each one of the data group, mapping the data of that data group to corresponding intermediate data for that data group and identifiable to that data group." Ex. 1 at 2 (Final Office Action, '610 Patent File History (Aug. 9, 2011)). In response, the Applicant amended the claims to add the disputed language and argued that the amended claims were distinguishable from Cruanes because it did not disclose "providing partitioned data from different schema data groups ***to different mapping tasks*** . . . ." Ex. 2 at 16-17 (Amendment After Final Office Action, '610 Patent File History (Nov. 17, 2011)) (emphasis added). Applicant further argued that Cruanes "describe[d] partitioning the initial employee and department tables and sending partitions to different nodes" but such nodes did "not provide a plurality of mapping functions that output lists for keys found

in the data partition, ***in the manner claimed***." *Id*. at 17 (emphasis added).  The prosecution history demonstrates that both the applicant and the examiner understood the phrase "a plurality of mapping functions that are each user-configurable" to require the ability to individually configure the mapping functions such that each could perform "different mapping tasks."  Given that this language was relied on to obtain allowance of the claims, it cannot now be disregarded.  *See Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1374 (Fed. Cir. 2007) ("[A]n applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well.").[4]

Third, despite Plaintiff's contrary assertion, the specification ***does*** describe the mapping functions in a way that demonstrates they are individually configurable.  For example, the ability to make each map function "individually configurable" is a distinction that the patent makes between the conventional MapReduce (described by the patent as prior art) and the purportedly "improved" MapReduce that is the subject of the '610 Patent.  The patent explains that in the conventional MapReduce, "[t]he programmer specifies a map function" and that map function (within the example of Figure 1 from the patent) "has seven invocations 104(1) through 104(7)." *See* '610 Patent at Fig. 1 *and* 2:21-35.  That is, the same map function is repeated for all input data. In contrast, the patent explains (with reference to Figure 4) that, in the purportedly "improved MapReduce architecture," map functions corresponding to the various data groups may be the same, but it is also possible to use different map functions for each group.  '610 Patent at 3:48-52.

---

[4] *See also Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 33 (1966) ("Claims as allowed must be read and interpreted with reference to rejected ones and to the state of the prior art; and claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent.").

For each map function to be different depending on the data group, each map function must be individually configurable.

As another example, the patent provides a comparison of "sample syntax" for map functions in the conventional MapReduce and those in the purportedly "improved" MapReduce. The patent explains that, in the conventional MapReduce, a map function is written as "map (in_key, in_value)," but in the "improved" MapReduce, map functions are written as "map(**group_id**, in_key, in_value)." *Compare* '610 Patent at 2:24-35 *with* 4:39-50 (emphasis added). The addition of "group_id" demonstrates that the patent contemplates some differentiation among map functions with respect to the data group they are processing.

For these reasons, the court should adopt Defendants' construction and reject Plaintiff's contention that each mapping function in the claimed "plurality of mapping functions" need not be individually user-configurable or that the "plain and ordinary meaning" is sufficient to convey the meaning of this claim language.

### 2.    *"the first data group is mapped differently than the data of the second data group" (Claims 1, 17)*

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning. | "the mapping functions are different for the first data group and the second data group" |

The dispute with respect to this term centers on whether "mapped differently" requires that the mapping functions are different for the first and second data groups, as is reflected in Defendants' proposed construction. Plaintiff argues that Defendants' construction is improper because the claims require merely that the data of the data groups be "mapped differently," but Plaintiff fails to explain how that could be accomplished without different mapping functions for each data group. Thus, construction of this term is necessary to clarify for the jury that the phrase

"mapped differently" relates to the operation/configuration of the claimed "mapping functions."[5] *See TQP Dev., LLC v. Merrill Lynch & Co.*, No. 2:08-CV-471-WCB, 2012 WL 1940849, at *2 (E.D. Tex. May 29, 2012) (Bryson, Circuit J.) ("construction of the disputed claim language will assist the jury to understand the claims.").

Defendants' construction is supported by the specification, which characterizes the ability to use different mapping functions for different data groups as an advantage of the purportedly "improved MapReduce" that is the subject of the '610 Patent. *See* '610 Patent at 3:48-56. Indeed, the '610 Patent's only example of the "improved MapReduce" in application—described with reference to figures 4 and 5—uses a different map function for each data group. Specifically, in the described example, the map function for the Employee table 302 data group written "map('emp', 34, 'Smith')" is different than the map function for the Department table 304 data group written "map('dept', 34, 'Clerical'). *See id.* at 7:40-59.

When a patent "describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) (citations omitted); *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1368 (Fed. Cir. 2007) (specification's description of a "critical element" found limiting)). Because the '610 Patent describes its "improved MapReduce architecture" as having different map functions for each data group and characterizes this as an advantage over the conventional MapReduce, "mapped differently" should be construed to align with that description of the invention, as Defendants' have proposed.

---

[5] *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("Because the meaning of a claim term . . . is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to . . . the words of the claims themselves, the remainder of the specification, [and] the prosecution history" to determine the meaning of the claim language.)

Plaintiff's contention that Defendants' construction should be rejected because the term selected for construction leaves out the words "the data of" in "the data of the first data group" is unavailing. *See* Br. at 20. Defendants' construction is intended to address the meaning of the phrase "mapped differently," and would not change even if the construed phrase were expanded to include the additional language. As explained above, within the context of the claim and the patent "mapped differently" means that "the mapping functions are different" for different data groups. That does not change whether the construed phrase is "the first data group is mapped differently than the data of the second data group" or "***the data of*** the first data group is mapped differently than the data of the second data group." In any event, Defendants' are agreeable to expanding both the construed phrase and Defendants' proposed construction to include these three words.

For these reasons, the Court should adopt Defendants' proposed construction.

### 3.    "data group" (Claims 1-2, 4, 17-18, 33, 40)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning. | "a group of data having the same schema and a mechanism for identifying data from that group (e.g., a group identifier)" |

"Data group" has a particular meaning within the context of the '610 Patent that is repeatedly and consistently used. Under such circumstances, "it is proper to construe the claim term in accordance with that characterization." *Maxell Ltd. v. Apple Inc.*, No. 5:19-CV-00036-RWS, 2020 WL 10456875, at *29 (E.D. Tex. Mar. 18, 2020) (citations omitted).

The '610 Patent's special use of "data group" is central to the purportedly "improved MapReduce architecture" that is the subject of the patent. *See* '610 Patent at 1:66-2:2. ("The inventors have realized that, by treating an input data set as a plurality of ***grouped sets*** of key/value pairs, the utility of the MapReduce programming methodology may be enhanced."). In accord

with the first part of Defendants' construction, the specification explains that, "[i]n the improved MapReduce architecture,…data sets within the same group are characterized *by the same schema*," and "data sets within different groups are characterized by different schemas." *Id*. at 3:52-56. The specification further explains, in accord with the second part of Defendants' construction, that "data groups enable[] *a mechanism to associate (group) identifiers* with [(1)] data sets, [(2)] map functions and iterators (useable within reduce functions to access intermediate data) and, [(3)] also, to produce output data sets with (group) identifiers." *Id*. at 3:58-60. The plain and ordinary meaning of "data group" fails to capture the fact that a "data group" within the context of the '610 Patent's "improved MapReduce architecture" is a group of data having the same schema and a mechanism for identifying data from that group.[6]

The exemplary embodiment described by the patent reinforces the accuracy of Defendants' construction. Referring to Fig. 4, the '610 Patent discloses that "each of the map tasks 402 and 404 are configured to operate on separate data groups, where *each of the separate data groups is characterized by its own schema*." *Id*. at 3:65-4:1 (emphasis added). As each data group proceeds through the MapReduce process, "the intermediate data E' and D' retain *an identification with the groups to which the original input data…belong*." *Id*. at 4:4-7 (emphasis added). And "the partitioned data 406 and 408, after partitioning the records of the intermediate data to the various reduce tasks 410 and 412, *retain an identification with the groups of the original input data*." *Id*. at 4:14-18 (emphasis added). Within the context of FIG. 5, the "group_id" that is the mechanism for identifying data from the "Employee table 302" is "Emp" and for the "Department

---

[6] Despite Plaintiff's contrary assertion, these descriptions of "the improved MapReduce architecture" are not limited to a particular embodiment, but apply broadly to the "improved MapReduce architecture" that is the purported invention of the '610 Patent. *See id*. at 3:52-60. *See Verizon*, 503 F.3d at 1308 ("When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention.").

table 304" it is "Dept." *Compare* '610 Patent at 4:45 *with* 7:45 *and* 7:55 (showing examples of "emp" and "dept," respectively, as the group_id in sample map functions).

While the intrinsic record makes the meaning of "data group" clear within the context of the '610 Patent, the plain and ordinary meaning of "data group" could mean any group of data. To avoid confusion on the part of the jury, the court should adopt Defendants' construction to assist a jury in accurately understanding and applying the claims. *See TQP*, 2012 WL 1940849, at *2.

### 4.    "*data partition*" (Claims 1, 17, 33, 40)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning. | "a portion of data from a data group that is the input to a map function" |

Construction of this term is necessary to assist the jury. *See TQP*, 2012 WL 1940849, at *2. As Plaintiff points out in its brief, the specification of the '610 Patent uses the term "partition" to broadly refer data that is partitioned from a number of different sources (*e.g.*, data sets, data groups, and/or intermediate data). *See* Br. at 23. The claims, however, recite a specific type of partition—a "data partition." And although the claims themselves demonstrate that a "data partition" is (1) a portion of data that is partitioned from a data group (as opposed to a portion of data partitioned from a data set or intermediate data), and (2) the input to a map function, construction is nonetheless required to avoid confusion with the other sorts of partitions described in the specification. Indeed, Plaintiff's argument that Defendants' construction  of "data partition" is inconsistent with the many other ways the specification uses the term "partition" illustrates the exact risk of confusion Defendants seek to avoid with their construction. *See* Br. at 23. The plain language of the claims demonstrates that a "data partition" is "a portion of data from a data group," as opposed to a portion of data partitioned from a data set or intermediate data. For example, the first step of claim 1 recites "***partitioning the data of each one of the data groups*** into a plurality of data partitions." '610 Patent at 8:63-64.

Despite this plain language, Plaintiff nonetheless contends that the term "data partition"—as used in claims 1 and 17—should be broadly interpreted to encompass data that is partitioned from data sets and/or intermediate data.  Br. at 23.  To support this argument, Plaintiff points to claims 33 and 40, which recite "partitioning the first data set into a plurality of data partitions." *Id.*  But Plaintiff's argument is based on an incorrect reading of those claims.  Although claim 33 recites "partitioning the first data set into a plurality of data partitions," it further recites that the "first data set *belongs* to a first data group."  '610 Patent at 12:48-50.  The same is true for claim 40.  *Id.* at 13:46-48.  Thus, there is no inconsistency between Defendants' proposed construction and the language of claims 33 and 40 because the first data set—from which the data partitions of claims 33 and 40 are created—is a *subset* of the first data group.  That is, the "data partition" of claims 33 and 40 is also "a portion of data from a data group."

The plain language of the claims further demonstrates that the claimed "data partition" is the input to a map function.  For example, claim 1 recites "providing each data partition to a selected one of a plurality of mapping functions."  '610 Patent at 8:64-66.  Although Plaintiff agrees that this language "explicitly establishes that each data partition is provided to a mapping function," Plaintiff attempts to distinguish being "provided to" a map function from being "the input to" a map function.  *See* Br. at 22-23.  But Plaintiff has not identified any actual distinction between the two.

Although the claims themselves establish the features of a "data partition" reflected in Defendants' construction, an express construction of the term is nonetheless necessary to provide clarity to the jury in view of the many ways "partition" is used within the patent.  Because Plaintiff's "plain and ordinary meaning" proposal fails to provide this clarity, it should be rejected.

**5.** **"*including processing the intermediate data for each data group in a manner that is defined to correspond to that data group, so as to result in a merging of the corresponding different intermediate data based on the key in common*" (Claim 1)**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning. | "processing the intermediate data differently based on which data group the intermediate data came from and merging the intermediate data regardless of what data group it came from based on the key in common" |

Construction of this term is necessary to clarify the distinction between the purportedly "improved MapReduce architecture" that is the subject of the claims and the conventional MapReduce architecture that is also described in the patent. Without construction, a jury will not understand the scope of the claimed invention as compared to the admitted prior art. *See TQP*, 2012 WL 1940849, at *2. For example, the Background section of the '610 Patent explains that the Reduce function in Google's conventional MapReduce architecture "takes intermediate results *via a single iterator* and combines elements as specified by the reduce function." '610 Patent at 1:25-27 (emphasis added). In contrast, when discussing the purported invention, the specification describes the Reduce function differently, explaining that "[t]he intermediate results of the map processing...for a particular key are processed together in a single reduce function *by applying a different iterator to intermediate values for each group*." *Id*. at 1:37-40 (emphasis added); *see also id*. at 2:4-8. "In the improved MapReduce architecture...partitioning the data sets into data groups enables a mechanism to associate (group) identifiers with...iterators (useable within reduce functions to access intermediate data)....." *Id*. at 3:48-61. That is, the data groups enable the reducing step to "process[] the intermediate data differently based on which data group the intermediate data came from" as indicated in Defendants' construction.

Likewise, in the exemplary embodiment described in the patent, the "reduce tasks 410 and 412 can access partitioned intermediate data for both groups 302 and 304 through one iterator per

group, and the ***reduce tasks 410 and 412 can be programmed by users to use the iterators however desired***." *Id.* at 4:18-22 (emphasis added). The result is that "the reduce function ***merges all intermediate data over all groups***." *Id.* at 4:56-57 (emphasis added). The claimed "including" phrase that Defendants' seek to construe concerns the fact that, in the "improved MapReduce architecture" of the '610 Patent, the reducing step processes intermediate data differently based on which data group the intermediate data came from and merges the intermediate data regardless of what data group it came from based on the key in common.

Plaintiff's "plain and ordinary meaning" proposal fails to provide the necessary clarity regarding the distinction between the purportedly "improved MapReduce architecture" that is the subject of the claims and the conventional MapReduce architecture that is also described in the patent. For that reason, Plaintiff's proposal should be rejected.

### 6.    *"data set" (claims 1, 17, 33, 34, 40, 41)*

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning. | Indefinite. |

The term "data set" is indefinite because it is deployed alongside "data group" in an irreconcilably incoherent way. "Data set" appears in the preamble of claims 1 and 17,[7] and the

---

[7] While Plaintiff "does not concede that the preamble of Claim 1 is limiting," Br. at 21 n.2, Plaintiff also does not explicitly deny that the preamble is limiting, and even affirmatively asserts that the preamble "offers context germane to" claim 1. In any case, Plaintiff offers no argument why the preamble should be non-limiting, and the antecedent basis rule is sufficient to render the preamble limiting. The body of claim 1 references "the data" and "the data groups," and the only antecedent basis for these terms is the preamble. '610 Patent, Claim 1 at Preamble ("A method of **processing data of a data set** over a distributed system, wherein the data set comprises **a plurality of data groups**, the method comprising: partitioning **the data** of each one of **the data groups**….."); *see Ahern Rentals, Inc. v. EquipmentShare.com, Inc*, No. 2:20-CV-00333-JRG, 2021 WL 4891379, at *8–*9 (E.D. Tex. Oct. 19, 2021) (finding "[t]he preamble is limiting" because "'[t]he machine' in the body clearly refers back to, and derives antecedent basis from, the 'rental machine' of the preamble"); *In re Fought*, 941 F.3d 1175, 1178 (Fed. Cir. 2019) ("We have repeatedly held a preamble limiting when it serves as antecedent basis for a term appearing in the body of a claim.") (collecting cases). The same is true of claim 17, which is an apparatus claim, where the entire apparatus appears in the preamble (alongside "data set").

body of claims 33, 34, 40, and 41. As used in those claims, and in particular at least the irreconcilable uses in claims 1 and 33, "data set" is indefinite.

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). "Both claims and the rest of the specification are part of the patent disclosure." *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 978 (Fed. Cir. 2002). "Certainly the [claim] is a disclosure of itself." *Id.* (quoting *In re Frey*, 166 F.2d 572 (C.C.P.A. 1948)) (alteration in original). Accordingly, "claims must be read in view of the specification, of which they are a part." *Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1362 (Fed. Cir. 2007) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc)). Moreover, "claims may be indefinite when a conflict between the claimed subject matter and the specification disclosure renders the scope of the claims uncertain." *In re Anderson*, 106 F.3d 425 (Fed. Cir. 1997). Indeed, "a skilled artisan would look for clarification not only in the specification but also in '[o]ther claims of the patent in question,' which 'can also be valuable sources of enlightenment as to the meaning of a claim term.'" *TVnGO Ltd. (BVI) v. LG Elecs. Inc.*, 861 F. App'x 453, 460 (Fed. Cir. 2021) (quoting *Phillips*, 415 F.3d at 1314). When a skilled artisan "would discover an inconsistency" in how a claim term is used, that inconsistency results in "throwing the meaning of [that term] into doubt" unless it can be reconciled. *Id.*; *Icon Health & Fitness, Inc. v. Polar Electro Oy*, 656 F. App'x 1008, 1016 (Fed. Cir. 2016).

At the outset, Plaintiff has waived any opposition to Defendants' position that "data set" is indefinite by failing to brief definiteness in its Opening Brief. *See infra* Section III.G. As detailed below, the Court should deem Defendants' arguments unopposed and deem "data set" to be

indefinite. *Id.*

The term "data set" is used inconsistently across the claims of the '610 Patent in a way that makes the claims incomprehensible. Claim 1 and the specification make clear that a "data set comprises a plurality of data groups." '610 Patent at Claim 1; *id.* at 3:48-50 ("[T]he input, intermediated and output data sets are partitioned into a set of data groups."). In other words, "data set" is the term generally used to refer to a collection of data groups, such that data groups are the constituent parts and the data set refers to the overarching whole. These distinctions are not idle— these terms are used to differentiate how the data must be organized, and to specify what actions must be performed on what data.

This understanding provided in claim 1 is rendered incoherent by claim 33, which contradicts claim 1 in its usage of "data set." Claim 33 requires that a "data set ***belongs*** to a first data group." *Id.* at Claim 33. That requirement is repeated in claim 40 as well, which requires a "first data set" that "belongs to a first data group." *Id.* at Claim 40. As disclosed in claims 33 and 40, a data set is the subsidiary part, and the data group is treated as the overarching whole. Thus, the claims simultaneously provide that a data set is defined by ***containing*** data groups, while also being defined as being ***contained by*** data groups. This definition is recursive and conflicting: a data set is defined as containing data groups, which are defined as containing data sets (which, again, are defined as containing data groups), ad infinitum.

The "inconsistency" between the uses of "data set" in claims 1, 33, and 34 "throw[s] the meaning of [that term] into doubt." *TVnGO*, 861 F. App'x at 460. In the absence of a reconciliation between these claims—and Plaintiff has offered none—"the ambiguous nature of the distinction between the two claim terms renders them incapable of construction," causing this term to be indefinite. *Icon Health & Fitness*, 656 F. App'x at 1016.  Indeed, it is notable that Plaintiff has

failed to identify any plain meaning for "data set."  Nowhere in the short paragraph Plaintiff devoted to this term does it inform the Court or Defendants what "data set" means in the context of the '610 Patent.  Br. at 21.  Plaintiff's failure to offer any reconciliation for the contradictory uses of data set is fatal, because "a skilled artisan" would look to the "[o]ther claims of the patent in question," including claims 1, 33, and 40, and "would discover an inconsistency" in how "data set" is used. *TVnGO*, 861 F. App'x at 460. Accordingly, this term is indefinite.

### 7.    *"at least one output data group is a plurality of output data groups"* *(claims 2, 18)*

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning. | Indefinite. |

This term is indefinite because "at least one…is a plurality" is internally incoherent. This term appears in claims 2 and 18, which depend from claim 1 and 17, respectively. Claims 1 and 17 recite, in pertinent part, "reducing [/reduce] the intermediate data for the data groups **to at least one output data group**."  Claims 2 and 18 further require that the "at least one output data group is a plurality of output data groups."

Under well-settled claim construction principles, "use of the phrase 'at least one' means that ***there could be only one***." *See, e.g.*, *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999) (emphasis added). Moreover, "plurality" has a "plain and ordinary meaning of 'two or more.'" *Wanker v. United States*, 152 Fed. Cl. 219, 251 (2021); *SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech.*, 983 F.3d 1367, 1377 (Fed. Cir. 2021) ("The phrase 'a plurality of' means 'at least two of.'"). Plaintiff does not argue for a departure from these standard principles, nor dispute the applicable plain meanings for "at least one" and "plurality." Thus, the claims purport to encompass where "one output data group" ***is*** "two or more" output data groups. As literally written, claims 2 and 18 thus purport to cover an invention where "one" output data group is simultaneously also "two or more" output data groups.

- 15 -

A claim purporting to cover "1=2" is "nonsensical in the way a claim to extracting orange juice from apples would be," rendering the term "indefinite." *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1367 (Fed. Cir. 2016). Indeed, since the claims are not only literally incoherent but analytically impossible—basic principles of mathematics foreclose a result required by the plain claim language—the claims are indefinite. "That is, the plain meaning of the claim language yields a nonsensical result and, as such, the meaning of this term is not reasonably certain." *Omni MedSci, Inc. v. Apple Inc.*, No. 2:18-CV-00429-RWS, 2019 WL 3818762, at *13 (E.D. Tex. Aug. 14, 2019). Thus where, as here, claims recite an impossibility, they are invalid for indefiniteness under § 112. *See, e.g.*, *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1366–67 (Fed. Cir. 2021) (holding claims reciting "generating a [single] digital media file" that itself "compris[es] a directory of digital media files" indefinite, as the claims were nonsensical and required an impossibility).

Plaintiff has waived any opposition to Defendants' position because it failed to brief it in its Opening Brief. *See infra* Section III.G. However, any attempt by Plaintiff to remove the incoherency from this claim would necessarily require rewriting the claim nearly a decade after the '610 Patent issued, to remove either the term "one" or to remove "plurality"—both cannot be simultaneously given their full and plain meaning. "The Court is bound to 'construe the claim as written, not as the patentees wish they had written it.'" *Omni MedSci*, 2019 WL 3818762, at *13 (quoting *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1373–75 (Fed. Cir. 2004)). "Even a nonsensical result does not require the court to redraft the claims of the [asserted] patent. Rather, where as here, claims are susceptible to only one reasonable interpretation and that interpretation results in a nonsensical construction of the claim as a whole, the claim must be invalidated." *Chef Am.*, 358 F.3d at 1374 (cleaned up). Since Plaintiff cannot ask the Court to read out "at least one"

(or "is a plurality") from these claims, the Court must "construe the claim as written," and hold that claims 2 and 18 are indefinite. *Omni MedSci*, 2019 WL 3818762, at *13.

**B.     '157 Patent[8]**

**1.     *"intents" (asserted claims 1, 2, 3)***

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "goals that users pursue in a search query" | Indefinite. |

The term "intents" is indefinite because (1) Plaintiff admits that it turns on the varying and subjective views of users, (2) the patent offers no objective way to distinguish between "conventional search engine and search ranking technologies" and the claimed approach to searching, and (3) Plaintiff has waived any right to oppose Defendants' position.

As an initial matter, Plaintiff has waived its opposition to Defendants' position that "intents" is indefinite by failing to brief definiteness on the merits. *See infra* Section III.G. As extensively detailed below, the Court should deem Defendants' arguments unopposed and deem "intents" to be indefinite. *Id.*

Both parties agree that the specification defines "intents" as follows: "An intent ***is*** a mapping from many combinations of keywords to a relatively small set of common goals that users pursue in a search query or session of multiple queries." '157 Patent at 9:44-47 (emphasis added); Br. at 25 ("Plaintiff's proposed construction comes verbatim from [this part of] the specification"). Both parties also agree that the patentee's use of "is" reflects that "[t]he patentees thus acted as their own lexicographer." *See, e.g.*, Br. at 34 (arguing, correctly, that "is" reflects lexicography and citing appropriate authority for the same). That understanding is consistent with well-established law providing that a specification's use of the term "is" indicates that the patentee

---

[8] Plaintiff asserts this patent against Deezer and Walmart.

intended that disclosure to serve as lexicography. *Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007). Specifically, when the specification states that a "[claim term] is [something]," the use of the word "is" should "signify that a patentee is serving as its own lexicographer." *Id.* Indeed, when there is "nothing extraordinary to the contrary," courts treat "is" as lexicography. *Scripps Rsch. Inst. v. Illumina, Inc.*, 782 F. App'x 1018, 1022 (Fed. Cir. 2019). Given the agreement of the parties and the wording of the specification, this lexicography binds Plaintiff. That is particularly true because, as noted above, Plaintiff explicitly asserts identical language showing that it "acted as [its] own lexicographer." Br. at 34 (arguing, correctly, that specification language disclosing that "***a document is*** [...]" reflects that "[t]he patentees thus acted as their own lexicographer," citing appropriate authority for the same); *cf.* '157 Patent at 9:44 ("***an intent is*** [...]"). However, because the lexicography lacks objective boundaries, it is indefinite.[9]

### a) "Relatively Small Set of Common Goals" Renders "Intent" Indefinite

The '157 Patent acknowledges that conventional systems, such as those offered by Google or Yahoo!, previously disclosed searching based on queries. *Id.* at 3:46-48. This conventional approach, which the '157 Patent terms the "bag of words" approach, searched for results "that contain, or are otherwise associated with, the individual words within the query." *Id.* at 4:1-15. However, "[b]ecause the quantity of information" available online "is so great," *id.* at 1:21-26, searching through results for ***any*** association was allegedly inefficient. As a result, the '157 Patent asserts that its approach is distinguishable from "conventional search engine and search ranking

---

[9] There is also no inconsistency between recognizing a patentee's lexicography and noting that such lexicography renders a claim invalid. Lexicography flows from the principle that a patentee may define terms in the specification in the manner of her choosing, and that the patentee may adopt definitions which are ultimately deemed indefinite.

technologies." '157 Patent at 8:64. Rather than simply seeking any association with query terms, as the "bag of words" approach provides, the claims require determining associations between search results and "a relatively small set of common goals that users pursue." *Id.* at 9:44-47. But this requirement renders the claims indefinite, because "relatively small" lacks both a definite baseline (i.e., small relative to what?) and objective criterion for size (i.e., how small is small enough?).

Plaintiff cannot escape indefiniteness by attempting to trim off "relatively small set" from the description of "intent" provided in the specification. First, courts must effectuate a patentee's word choices, including the choice to use "is" to define a term, when there is "nothing extraordinary to the contrary." *Scripps Rsch.*, 782 F. App'x at 1022. Moreover, Plaintiff affirmatively argues that a person of skill would look to this portion of the specification to inform the scope of the term "intent." Br. at 25. But Plaintiff provides no basis for ignoring half of the disclosure in the specification while relying on the other half "verbatim" for "Plaintiff's proposed construction." *Id.* Finally, the nature of the invention requires acknowledging that the set of goals is "relatively small," because the "relatively small" size of the "common goals" is what allegedly enables efficiency relative to the conventional approach. Thus, recognizing that "intent" requires a "relatively small set of common goals" is both compelled by the specification and the purpose of the invention, as well as being consistent with Plaintiff's own proposal and briefed arguments.

At the outset, "relatively small" lacks an objective baseline comparator in the specification of the '157 Patent. In short, the '157 Patent does not give an objective answer to the question "small relative to what?" As with other terms of comparison, terms like relatively "have little meaning without some baseline reference point." *ESIP Series 1, LLC v. Doterra Int'l, LLC*, No. 2:15-cv-779-RJS-DBP, 2021 WL 1516010, at *12 (D. Utah Apr. 16, 2021). *ESIP* construed similar

terms, "comparatively smaller droplets" and "comparatively larger droplets," and explained its concern that the absence of a baseline comparator would render the terms indefinite. *Id. ESIP* explained that "the Supreme Court found the same term, 'comparatively small,' did not 'add anything to the claims, for nowhere are we advised what standard is intended for comparisons'" and determined that "the claims" at issue were invalid "for indefiniteness." *Id.* at *12 (quoting *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 235, 238 (1942)). After noting that the claims would be invalid without a baseline comparator, *ESIP* concluded that it would define "comparatively smaller droplets" based on an "objective boundary" disclosed in the patent, which defined the smaller relative size as being "about 1 micron to about 5 microns." *Id.* As a result, *ESIP* found the patent disclosed an appropriate comparator: if the size of the droplets in *ESIP* was "greater" than 5 microns, it was a "comparatively larger," while if it fell within the 1-5 micron range, it was "comparatively smaller." *Id.*

*ESIP*'s application of Supreme Court precedent is instructive here because it demonstrates that the '157 Patent fails to disclose an objective baseline comparator. Unlike the *ESIP* patent, which included an explicit and discrete numerical range, the '157 Patent does not identify any objective reference point against which to determine whether a set of searching goals is "relatively small" enough to qualify for the patentee's definition of "intent." Because "[t]he specification contains no point of comparison for skilled artisans to determine an objective boundary," the claims are indefinite. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1364 (Fed. Cir. 2018).

Another, related flaw is that "relatively small set of common goals" is indefinite because it "does not provide an objective standard by which to determine" if a set is relatively small. *See Semcon IP Inc. v. Huawei Device*, No. 2:16-cv-437-JRG-RSP, 2017 WL 2972193, at *25 (E.D. Tex. July 12, 2017). This is related to the absence of a comparator, but addresses a distinctive flaw:

even if the patent disclosed a base size for comparison, it must also teach persons of skill how much size-variation from that base comparator is still permissible before a "set of common goals" ceases to be "small." *See id.*

This Court confronted a similar term, "relatively short messages" and found it to be indefinite. *Id.* "[R]elatively" is a "term of degree," which requires "an objective standard by which to determine" what is "relatively" short or long. *Id.* In the absence of "guidance regarding what it means" to be "relatively short," the Court found the term lacked the objective boundaries required by *Nautilus*. *Id.* (citing *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014)). That was particularly true because the patentee introduced "no evidence" that the term "is a term of art with a customary objective meaning." *Semcon*, 2017 WL 2972193, at *25. Absent explicit, clear guidance, the term "relatively short" "[s]imply…does not adequately 'appris[e] the public of what is still open to them.'" *Id.* (quoting *Nautilus*, 572 U.S. at 910). Accordingly, the Court concluded that "Defendants have proven" the claim "is indefinite by reason of the uncertainty in the meaning of 'relatively short messages.'" *Id.*

The holding of *Semcon* squarely governs this case. As in *Semcon*, "relatively small" is a term of degree that requires "an objective standard." *Id.* As in *Semcon*, the '157 Patent lacks any disclosure of an objective boundary for the number of goals that are "relatively small," including when that number of goals has been exceeded (such that a member of the public does not infringe). Notably, Plaintiff does not assert to the contrary in its opening brief: unlike the patentee in *Semcon*—who cited intrinsic evidence attempting to show a boundary, but ultimately failed to convince the Court that an objective boundary exists—Plaintiff has ***altogether failed*** to brief the existence of any such boundary. *See infra* Section III.G. Accordingly, the record before the Court presents an easier case supporting indefiniteness than the record deemed sufficient in *Semcon*. Put

"[s]imply," the '157 Patent fails to "adequately 'apprise the public'" of how to determine when it treads from a permissibly-sized set of goals into an infringing "relatively small set of…goals." *Id.* Thus, this term "is indefinite by reason of the uncertainty in" its meaning. *Id.*

Plaintiff tersely suggests that the '157 Patent's disclosure of exemplary intents is enough to provide definiteness, but Federal Circuit law forecloses its suggestion. As an initial matter, while examples can be informative, a patent must include both "a general guideline" ***and*** "examples sufficient to enable a person of ordinary skill in the art to determine [the scope of the claims]." *Zadro Prod., Inc. v. SDI Techs., Inc.*, No. 17-1406 (WCB), 2019 WL 10252726, at *4 (D. Del. June 19, 2019) (Bryson, Circuit J.) (alteration original) (quoting *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1335 (Fed. Cir. 2010)). No "general" guideline is apparent either for a base comparative size, or for the amount of variation that is permissible in the number of goals. Second, Plaintiff only cites non-limiting examples. *See, e.g.*, Br. at 25, quoting the '157 Patent ("**examples** of intents relating to product queries can be, **for example**: [seven words]"); *id.* ("**examples** of intents relating to local/map queries: [six words]."); *id.* at 26 ("In another example, a user may enter a query for a consumer product such as a 'Nikon D60'…but might be interested in, **among other things**: [five descriptions of categories of information]").

Moreover, "such *non-limiting* examples do not on their own expressly define the bounds—the *limits*—of the claim." *IQASR LLC v. Wendt Corp.*, 825 F. App'x 900, 906 (Fed. Cir. 2020) (emphasis in original). "A patentee cannot simultaneously…avoid limiting the scope of an invention while also arguing that those same examples define the limits of the invention." *Id.* Here, each of the examples given by Plaintiff make clear they are just that: "examples." Nor does Plaintiff suggest those examples "define the bounds—the limits—of the claim[s]" at issue. *Id.* For example, Plaintiff does not suggest that the claims are limited to the number of "common goals"

(between five and seven) provided in its examples. Plaintiff does not concede that a "relatively" larger number of "common goals"—say, 10-14, double the number identified in the examples from Plaintiff—would fall outside of the claims. Accordingly, the self-described non-limiting examples cited by Plaintiff, combined with the absence of a "general guideline" on the number of goals required to infringe, renders the "intents" term indefinite.

The indefiniteness of "intents" is confirmed by the inability to definitely state "what falls outside the boundaries of the claims" based on the set of examples, another litmus test for the public notice function of the definiteness requirement. *Versata Software, Inc. v. Zoho Corp.*, 213 F. Supp. 3d 829, 836 (W.D. Tex. 2016). Whether by those examples or otherwise, Plaintiff fails to identify any objective guideline to determine when the public has transitioned from permissible, conventional results broadly "associated with" a query ('157 Patent at 4:2-5) into an infringing act based on a sufficiently "small set of common goals." *See* '157 Patent at 9:45.

Thus, "intents" is indefinite on three independent, intertwined grounds: it fails to identify an objective baseline for "relative[]" comparison; an objective measure for what is sufficiently "small" to meet the claims; and an objective outer limit to appraise the public of what remains available.

> **b)**    **"Goals that Users Commonly Pursue" / " A Goal the User Pursues in a Search Query" Is An Inherently Subjective Moving Target, Rendering "Intent" Indefinite**

"Intent" is also indefinite because "goals that users commonly pursue" is both a moving target—as a general matter—and a matter of subjective intent for any given user. *Versata Software*, 213 F. Supp. 3d at 838 ("A claim term cannot be a moving target that changes over time.").

Plaintiff's proposed construction treats intent as equivalent to a goal that "the user pursues" in a given search query. Plaintiff's proposal is consistent with the specification, but inconsistent with the requirement of definiteness. Under Plaintiff's approach, a given search query may or may

not be infringing, depending on the goal that is subjectively being pursued by a given user. Notably, Plaintiff does not distance itself from the subjectivity embedded in its approach but embraces it wholeheartedly: Plaintiff emphasizes that "*the **entirety of the specification** makes clear that an 'intent' in the '157 patent is exactly what it sounds like it should be: the intent of **the user** during **the search**, e.g., a 'goal that a user pursues in a search query.*'" Br. at 25 (emphasis added). Defendants agree that the "entirety of the specification" is consistent with Plaintiff's subjective approach to intent. *See, e.g.*, 157 Patent at 5:17-19 ("Second, after clicking on a search result, the context of landing page fits the goal of the user."). But that subjectivity is fatal to any claim of definiteness. Claim terms are indefinite as "a moving target" if their scope "may change over time" or if "the scope could vary from day-to-day and from person-to-person." *Icon Health & Fitness, Inc. v. Polar Electro Oy*, 656 F. App'x 1008, 1016 (Fed. Cir. 2016). Here, Plaintiff explicitly asserts that "the intent of the user during the search" is what determines whether or not a claimed "goal that a user pursues" is present. Br. at 25. Put another way, two users could run the same query in the same search engine, one who subjectively possesses a "goal…in a search query," and one user without such a goal, who merely browses aimlessly. Br. at 25. Under Plaintiff's theory, the former user would infringe, while the latter would not. Plaintiff's construction thus provides a quintessential moving target with respect to whether a given search would "vary," in terms of infringement, "from day-to-day and person-to-person." *Icon Health*, 656 F. Appx at 1016.

Notably, even if "goals that users pursue" is understood to reference goals that users ***generally*** pursue, it would still be indefinite because that is a moving target. The goals that a collection of users pursue, at any given time, is necessarily a contingent and historical fact. As a result, a non-infringing search pursuing a goal that users do not commonly pursue may become an infringement, without any further action on a defendant's part, as the goal becomes more and more

commonly subject to searches. For example, the '157 Patent suggests that a user looking for product reviews would be a qualifying "intent" within the scope of the '157 Patent. '157 Patent at 5:6-9. But, recall the early days of the internet, when users did not commonly search for reviews online, given skepticism of anonymous online reviewers. At some point, searching for reviews changed from an anomalous goal into an ostensibly "common" one. Thus, even under an approach that defines goals as those generally pursued, the scope of infringing goals would still impermissibly vary "from day-to-day," contra to the requirement of definiteness. *Icon Health*, 656 F. App'x at 1016. Moreover, the '157 Patent offers no objective basis to distinguish between when a goal shifts from uncommon to common, and thus is indefinite.

### 2. *"determining, at least the one computing device, a plurality of intents...by a user submitting the query" (claim 1)*

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "determining, using the at least one computing device, a plurality of intents from the at least one keyword, wherein each of the plurality of intents indicates a type of information regarding the query keyword that is likely to be desired by a user submitting the query:" | Indefinite. |

Both parties appear to agree that this term, as written, contains flaws that render it invalid absent correction by the Court. *See, e.g.*, Br. at 27 (requesting correction); *Trusted Knight Corp. v. Int'l Bus. Machines Corp.*, 681 F. App'x 898, 904 (Fed. Cir. 2017) ("[A]s the claim limitation stands uncorrected, it does not inform those skilled in the art about the scope of the invention with reasonable certainty."). Thus, Plaintiff asks the Court to rewrite the claim in three distinctive ways: to change "determining," to "determining, using"; to change "at least the one" to "the at least one"; and to change "keyword, each" to "keyword, wherein." Plaintiff correctly concedes that district courts may not rewrite a patent claim unless two conditions are both independently met: "(1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the

claims." Br. at 27 (citing *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003)). Here, Plaintiff's corrections fail both prongs.

First, on the initial *Novo* requirement, having conceded an error, Plaintiff must prove that its correction "is not subject to reasonable debate." *AGIS Software Dev. v. T-Mobile*, 2:21-cv-72-JRG-RSP, Dkt. No. 213, at 28 (E.D. Tex. Nov. 10, 2021) (Payne, J.) (finding term "is indefinite" because "Plaintiff did not…show that the standard for judicial correction is met in this case"). As an initial matter, Plaintiff has not carried that burden, insofar as its entire analysis is the following single sentence: "The emphasized terms in Plaintiff's proposed construction correct minor typographical errors, and a POSA would naturally understand this to be apparent." Br. at 27. Plaintiff does not cite evidence supporting this claim, nor analogize to authority in support of its position. Because Plaintiff asks the Court to alter, nearly a decade after issuance, "the language the patentee has chosen to…claim…his invention," *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, No. 2:20-cv-00333-JRG, 2021 WL 4891379, at *8 (E.D. Tex. Oct. 19, 2021), the Court should hold Plaintiff to its burden and find it has not been met, rendering the term indefinite.

Second, Plaintiff's triply-proposed corrections are subject to "reasonable debate" regarding multiple plausible corrections under *Novo*. Notably, "[t]he Federal Circuit's standard does not ask the Court to decide which proposed construction is most plausible.  Rather the standard only asks the Court to decide if reasonable debate exists based on the claim language and the specification." *Parthenon Unified Memory Architecture LLC v. Apple Inc.*, No. 2:15-CV-00621-JRG-RSP, 2016 WL 3365945, at *13 (E.D. Tex. June 17, 2016) (citing *Novo*, 350 F.3d at 1354). "If the claim language might mean several different things and no informed and confident choice is available among the contending definitions, the claim is indefinite." *Uniloc USA, Inc. v. Samsung Elecs. Am., Inc.*, No. 2:18-CV-0041-JRG-RSP, 2019 WL 1614724, at *12 (E.D. Tex. Apr. 15, 2019)

(invalidating claims where there were multiple plausible corrections).

Here, there is reasonable debate about whether "determining, using" is the appropriate correction instead of "determining, by." Claim 1 is a method claim, and corresponds nearly verbatim to claim 2, which provides for "A computer-readable medium having computer-executable instructions for a method comprising the steps of:" and then recites the same steps as claim 1.

1. A method comprising the steps of:

receiving, over a network, a query from a user, the query comprising at least one query token;

analyzing the query, using at least one computing device, to identify at least one query keyword;

determining the one computing device, a plurality of intents from the at least one keyword, each of the plurality of intents indicates a type of information regarding the query keyword that is likely to be desired by a user submitting the query;

classifying the query, using the at least one computing device, into at least one of the plurality of intents;

identifying, using the at least one computing device, a plurality of data objects available over the network that match the at least one query keyword;

assigning, using the at least one computing device, at least one of the plurality of intents to at least some of the plurality of data objects;

ranking, using the at least one computing device, the plurality of data objects;

building a result, using the at least one computing device, using the ranked plurality of data objects, the result comprises a plurality of display entries, at least one display entry customized to a respective assigned intent is constructed for each of the ranked plurality of data objects; and

transmitting the result, over the network, to the user.

2. A computer-readable medium having computer-executable instructions for a method comprising the steps of:

receiving, over a network, a query from a user, wherein the query comprising at least one query token;

analyzing the query, using at least one computing device, to identify at least one query keyword;

determining a plurality of intents, by the computing device, from the at least one keyword, each of the plurality of intents indicates a type of information regarding the query keyword that is likely to be desired by a user submitting the query;

classifying the query, using the at least one computing device, into at least a subset of the plurality of intents;

identifying, using the at least one computing device, a plurality of data objects available over the network that match the at least one query keyword;

assigning, using the at least one computing device, at least one of the plurality of intents to at least some of the plurality of data objects;

ranking, using the at least one computing device, the plurality of data objects;

building a result, using the at least one computing device, using the ranked plurality of data objects, the result comprises a plurality of display entries, wherein at least one display entry customized to a respective assigned intent is constructed for each of the ranked plurality of data objects; and

transmitting the result, over the network, to the user.

'157 Patent at Claim 1, 2. Further, claim 1 and claim 2 were prosecuted in parallel and amended to recite consistent limitations. *See, e.g.*, Ex. 3 at 3, 9-10 ('157 Patent, 5/18/2012 Amended Claims, at claim 1 and then-numbered claim 30, which became issued-claim 2). Moreover, like claim 1, claim 2 contains "using" as the relevant verb for "analyzing," "classifying," "identifying," "assigning," "ranking," and "building a result" steps *but* omits "using" for the "determining" step. '157 Patent at Claims 1, 2. Instead, claim 2 recites "by" for the "determining" step. *Id.* Thus, claim 2 provides that the "determining" step is "determining…*by* the computing device" rather than

"determining…*using* the computing device." *Id.*

Rather than harmonizing claims 1 and 2, Plaintiff proposes a different correction and suggests that claim 1 should read "determining, ***using*** the at least one computing device" rather than "determining, ***by*** the at least one computing device." Br. at 27. Plaintiff's proposal is not unreasonable, but it is also not the only reasonable option: claim 2 also suggests that "determining by" would be a "plausible" interpretation. *Parthenon*, 2016 WL 3365945, at *13. Though Defendants are not required to show this, the competing proposals are materially different because they appear to implicate claim scope, as "determining by" appears to have a narrower meaning than "determining using."[10] Thus, Plaintiff's proposed correction is at least subject to "reasonable debate," such that "the claim language might mean several different things and no informed and confident choice is available among the contending definitions." *Uniloc*, 2019 WL 1614724, at *12. As a result, "the claim is indefinite." *Id.*

Third, Plaintiff's addition of the "wherein" clause is inconsistent with the prosecution history. A court can only render a correction if "the prosecution history does not suggest" a

---

[10] Both the canons of claim construction and common usage confirm that "by" and "using" plausibly mean different things. First, the patentee's proximate usage of "by" and "using" in claim 2 suggests that the patentee intended different meanings by using different words in the same claim. It is axiomatic that "different claim terms are presumed to have different meanings." *See Wapp Techs. v. Seattle Spinco*, No. 4:18-CV-469, 2020 WL 1983087, at *10 (E.D. Tex. Apr. 27, 2020) (quoting *Univ. of Texas Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008)). "The use of both terms in close proximity in the same claim gives rise to an inference that a different meaning should be assigned to each." *Bancorp Servs., LLC v. Hartford Life Ins.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004). The Court should effectuate and acknowledge the patentee's choice to use different words in claim 2. Moreover, common parlance confirms a difference between "by" and "using," because the former requires a very direct role—"this essay was written by John Doe"—while the latter merely requires some role and permits a more attenuated connection ("this essay was written using a computer, but also using a printed-out copy for redline"). Thus, under Plaintiff's construction of claim 1, "using" appears to be met if the claimed computing device has some role in performing the step (even if other computing devices also have a role), while under the parallel-with-claim-2 construction, the step must be done "by" the computing device.

different result. *Novo*, 350 F.3d at 1357. In the amendment where this limitation was added, the

patentee struck six separate wherein clauses from claim 1, rewriting them to intentionally omit

"wherein." Ex. 4 at 2, 8 ('157 Patent, 5/18/2012 Amended Claims, at claim 1 and then-numbered

claim 30, which became issued-claim 2) (deleting "wherein" clauses).  Those were the only two

actions in that amendment: eliminating "wherein" from all-but-one limitation and adding the

1.   (Currently Amended) A method comprising the steps of:

receiving, over a network, a query from a user, ~~wherein~~ the query comprising at least one query token;

analyzing the query, using at least one computing device, to identify ~~wherein~~ at least one query  keyword ~~is identified~~;

determining at least one intent from the at least one keyword, the at least one intent indicates a user's intent in submitting the query;

classifying the query, using the at least one computing device, ~~wherein the query is classified~~ into at least one intent ~~using the at least one query  keyword~~;

identifying, using the at least one computing device, a plurality of data objects available over the network that match the at least one query keyword;

ranking, using the at least one computing device, the plurality of data objects, wherein at least one of the at least one intent[[s]] is assigned to at least some of the plurality of data objects;

building a result, using the at least one computing device, using the ranked plurality of data objects, ~~wherein~~ the result comprises a plurality of display entries, ~~wherein~~ at least one display entry is constructed for each of the ranked plurality of data objects, ~~wherein~~ if a data object has been assigned at least one intent, such ~~intents are~~ intent is used to construct the display entry for the respective data object; and

transmitting the result, over the network, to the user.

30.   (Currently Amended) A computer-readable medium having computer-executable instructions for a method comprising the steps of:

receiving, over a network, a query from a user, wherein the query comprising at least one query token;

analyzing the query, using at least one computing device, ~~wherein~~ to identify at least one query  keyword ~~is identified~~;

determining at least one intent, by the computing device, from the at least one keyword, the at least one intent indicates a user's intent in submitting the query;

classifying the query, using the at least one computing device, ~~wherein the query is classified~~ into at least one intent ~~using the at least one query  keyword~~;

identifying, using the at least one computing device, a plurality of data objects available over the network that match the at least one query keyword;

ranking, using the at least one computing device, the plurality of data objects, wherein at least one of the at least one intent[[s]] is assigned to at least some of the plurality of data objects;

building a result, using the at least one computing device, using the ranked plurality of data objects, ~~wherein~~ the result comprises a plurality of display entries, wherein at least one display entry is constructed for each of the ranked plurality of data objects, ~~wherein~~ if a data object has been assigned at least one intent, such ~~intents are~~ intent is used to construct the display entry for the respective data object; and

transmitting the result, over the network, to the user.

"determining" step at issue here. *Id.*

Ex. 4. The final "wherein" in claim 1—a holdover in the "ranking" step—was stricken in the

immediately following amendment, and the claims then issued without further amendment. Ex. 3.

Accordingly, the prosecution history appears to reflect a choice by the patentee to draft its

claims in a manner that omits the "wherein" clause that Plaintiff now seeks to insert. *Cf. Novo*, 350

F.3d at 1357. Defendants agree that the claim is incoherent without something connecting the back

half of the "determining" step to its first half, but Plaintiff's proposed corrective connection is

irreconcilable with the prosecution history and thus impermissible under *Novo*. 350 F.3d at 1357. "[A]s the claim limitation stands uncorrected, it does not inform those skilled in the art about the scope of the invention with reasonable certainty." *Trusted Knight*, 681 F. App'x at 904. The claim is thus indefinite.

### 3.    *"wherein the at least one intent comprises an unclassified intent" (claim 3)*

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "wherein the at least one intent is not mapped from one or more keywords to a goal the user pursues in a search query" | "wherein the at least one intent comprises an intent for which no defined intents match the query" |

Both parties agree that Defendants' proposed construction flows directly from the specification, while Plaintiff's proposed construction is foreclosed by the same. The Court should adopt Defendants' proposal.

The specification explains that during the query analysis process, "[t]he query is then classified into one or more likely intents, which can include an unclassified intent when no defined intents match the query" at issue. '157 Patent at 9:42-44. Defendants' proposed construction tracks this description exactly. Plaintiff does not assert that this construction is contrary to the specification, the prosecution history, or any embodiment—to the contrary, Plaintiff affirmatively agrees that this disclosure "provides context that a POSA would consider" in defining this term. Br. at 28. Plaintiff simply asserts that its construction is more helpful to the jury.

Plaintiff's proposed construction conflicts with the specification and is otherwise flawed. Plaintiff's proposal is met when an intent "is not mapped" from "keywords…to a goal." As an initial matter, Plaintiff's proposal replaces the word "intent" (as part of this term) with a different construction than its standalone construction of "intent." Thus, Plaintiff's proposal is likely to exacerbate jury confusion rather than ameliorate it, by asking jurors to apply two different

definitions of the same term.[11] Moreover, the specification makes clear that "unclassified" is not merely the absence of any intent associated with a query, but instead is more akin to a miscellaneous category that is appropriate when "no defined intents match the query." *Id.*; *id.* at 5:3-4 (explaining that searching for a wildcard "matches any intent, including the unclassified intent"); *id.* at 11:55-56 (describing "one or more likely intents" as including "an unclassified intent"). Thus, "unclassified" is a species of the category intent—albeit a miscellaneous species—rather than the mere absence of an intent associated with a query.

Plaintiff's proposal contradicts these disclosures because it is met by the mere absence of intent. For example, under Plaintiff's proposal, all queries are "unclassified" immediately before the "intent is…mapped from…keywords to a goal." Br. at 28. At the outset of the "classifying" step, no query has yet been "classified," and the absence of such classification would create infringement under Plaintiff's proposal (since the intents are not, at that time, "mapped"). But the patent makes clear that this is incorrect: Plaintiff's absence-of-classification construction is inconsistent with the specification's miscellaneous-classification description. Because Plaintiff admits Defendants' proposal is consistent with the specification, while Plaintiff's proposal contradicts the specification, the Court should adopt Defendants' proposal for "unclassified."

Finally, Plaintiff suggests that its proposal is more helpful for the jury because it explains "how an intent comprises an 'unclassified intent.'" Br. at 29. Not so. Instead, Plaintiff introduces

---

[11] Plaintiff briefly suggests that Defendants' proposed construction of the term "unclassified" implies that "intent" is definite. Not so. Unlike Plaintiff, which provides a construction that modifies both "unclassified" and "intent" in this term, Defendants incorporates the word "intent" without gloss or characterization, focusing only on "unclassified." The only dispute on this term concerns the criterion for being "unclassified," and no part of this dispute depends, in any way, on whether Plaintiff has disclosed a legally sufficient objective criterion for determining intents (it has not). Plaintiff's suggestion that Defendants have implicitly abandoned their indefiniteness position on "intents" is nonserious.

new concept (e.g., "mapping") and leaves the term undefined and unclear, teeing up future disputes between the parties without adding additional value for the jury. Indeed, Plaintiff's proposal invites further disputes about whether a particular type of word-association qualifies as a "mapping," such that Plaintiff's proposal merely rephrases the term without adding clarity. Since Plaintiff's proposal is both unclear and substantively inaccurate, the Court should reject it and adopt Defendants' proposal.

### 4. *"the query is classified by linguistic analysis of the at least one query keyword" (claim 5)*

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning. | Indefinite. |

The term "linguistic analysis" is indefinite under a straightforward application of *Dow Chemical v. Nova Chemicals* because there is uncontroverted[12] evidence that linguistic analysis was performed "in more than one way" in the relevant art, with varying differences that would affect infringement, and without guidance from the specification for discerning which of the various methods appropriate. 803 F.3d 620, 634 (Fed. Cir. 2015).

*Dow Chemical* invalidated a claim involving "the slope of strain hardening," because there were at least "four methods" for measuring the slope parameter, and the methods "may produce different results." *Id.* at 633-34. "Because the methods do not always produce the same results, the method chosen for calculating the slope of strain hardening could affect whether or not a given product infringes the claims." *Id.* at 634. The Court emphasized that "[n]either the patent claims nor the specification here discusses the four methods or provides any guidance as to which method should be used or even whether the possible universe of methods is limited to these four methods." *Id.* Thus, "[t]he question is whether the existence of multiple methods leading to different results

---

[12] As explained below, Plaintiff has waived any opposition to Defendants' indefiniteness positions.

without guidance in the patent or the prosecution history as to which method should be used renders the claims indefinite." The answer from the Federal Circuit was "yes." *Id.* The term was invalid even though both the patentee's expert "testified that someone skilled in the art could determine which method was the most appropriate." *Id.* at 635. The claim was indefinite because "the required guidance is not provided by the claims, specification, and prosecution history." *Id.*

The uncontroverted record evidences two independent reasons that "linguistic analysis" is indefinite: (1) the intrinsic record lacks a principled boundary for "the possible universe of methods" to perform linguistic analysis, and (2) the uncontroverted extrinsic record shows "multiple methods leading to different results" for performing linguistic analysis. *Id.* Initially, the specification sheds no light on the nature of "linguistic analysis," as it makes only four passing references to linguistic analysis without describing that nature of that analysis or what it entails. *See, e.g.*, '157 Patent at 4:28-29 ("Such techniques could include linguistic analysis of the query itself."); *id.* at 9:54-55 ("query intent may be determined by linguistic analysis of query keywords"); *id.* at 11:56-57 ("query intent may be determined by linguistic analysis of query keywords"); *id.* at Claim 5 ("The method of claim 1 wherein, in the classifying step, the query is classified by linguistic analysis of the at least one query keyword."). The patent identifies no principled basis for determining what qualifies as linguistic analysis, nor even a description or examples of what such analysis entails. That is inadequate under *Dow*. Moreover, consistent with the public notice function of patents, "a skilled artisan must know 'not only what falls inside the scope of the claim term, but also what falls outside of it.'" *Versata Software*, 213 F. Supp. 3d at 836. These terse references are also "insufficient to show with reasonable certainty the scope of the claims, because they provide no information as to what falls ***outside*** the boundaries of the claims." *Id.* (emphasis added). Simply put, the intrinsic record fails to explain what a linguistic

analysis is in any manner that would enable the public to determine what a ***non***-linguistic analysis entails.

That concern is magnified because the uncontroverted record contains multiple, distinctive descriptions of what qualifies as a "linguistic analysis." Initially, the evidence of record shows that linguistic analysis is not a term of art with only one meaning. Ex. 5 at 2-224 (Al-Otaiby et al. 2005). At the time of patenting, the uncontroverted evidence of record shows that "[l]inguistic analysis is not used frequently in the field of computer science." *Id.* To the extent it was used at all, the phrase "linguistic analysis" entailed often inconsistent uses. For example, "linguistic analysis" sometimes focused on evaluating the "syntactic features," such as the "percentage of verbs and adverbs and…nouns" in a query. Ex. 6 at 1, 5 (Panckhurst 2006). Other "linguistic analysis" looked at the relationships between at the relationships those types of speech— "clustering" of different speech types, proximity of terms with those attributes, and grammatical relations between term elements. Ex. 5 at 2-224 (Al-Otaiby et al. 2005). Still other "linguistic analysis" looked for meaning in specific linguistic criteria, such as "copula" (e.g., the presence of special linking verbs like "is" or "becomes"), "apposition" (e.g., non-mutual modifying noun pairs, like how "Honorable Judge" modifies "Amos L. Mazzant"), "proposition" (e.g., "predicate-argument structures" showing a "logical subject, logical object, and object of a prepositional phrase"), and "relations" (discretionarily-identified binary relations, "such as spouse-of, staff-of, parent-of") Ex. 7 at 308-09 (Peng 2005); *but cf. id*. at 307, 314 (distinguishing "linguistic analysis" from "pattern learning" based on queries). Still other "linguistic analysis" looked at the length, diversity, and complexity of the entire query as a whole (e.g., ratios of verbs to total wordcount) (Ex. 8 at 4, Jensen et al. 2007), while yet more "linguistic analysis" focused on filtering out "structural errors," related to a query (Ex. 9 at 2, Pauw 2006). Yet another thread of computer

science literature defines linguistic analysis by downstream content, independent of the query, which is created after a query is submitted. For example, Leveling 2006 discloses a "linguistic analysis" that entails creating an elaborate system of tags, corresponding to categories, and then incorporating those tags into pattern analysis. Ex. 10 at 123.

Some "linguistic analysis" jettisoned focus on content entirely, and was deployed as a content-agnostic system defined by its dynamic, iterative adaptation. For example, some "linguistic analysis" focuses a particular universe of rules (linguistic analysis entails "rules for extracting facts," (Ex. 11 at 1262, Bitton et al. 2006)), with rules that differ and are irreconcilably inconsistent. Ex. 12 at 125; Ex. 13 at 256-57, 259, 264 (*compare* Neri et al. 2005 at 125, which requires linguistic analysis employ "Parsing, Morphological and Statistical rules," *with* Pazienza 2005 at 256-57, 259, 264, which provides that linguistic analysis is "simply…a set of linguistic filters" to "extract and recognize terms" and necessarily excludes "statistical" analysis which attempts to derive meaning from the terms).

All of these methods "could affect whether or not a given product infringes the claims," because they require different criteria and actions to be met. *Dow*, 803 F.3d at 634. For example, an accused system that simply identifies "nouns and verbs" might meet the "syntactic features" approach but not the rules-based iterative-learning approach. *See id.* Similarly, an accused system that merely uses "linguistic filters" but does not perform "statistical" analysis may or may not infringe, depending on the definition adopted. *See id.*

It was incumbent for Plaintiff to explain "how to find the boundaries" of this claim term in light of the specification.[13] *Saso Golf v. Nike*, 843 Fed. App'x 291, 295 (Fed. Cir. 2021).

---

[13] Nor should "linguistic analysis" be deeded to encompass all of the methods discussed herein. As an initial matter, any such suggestion should have been made in Plaintiff's opening brief. But

"[I]mportantly," Plaintiff has "never explained how to find the boundaries of the" term" and "nothing in the record" explains the boundaries." *Id.* "[N]or did [Plaintiff] offer any theory in its briefs." *Id.* (affirming district judge who found indefiniteness because "I am not aware of a single, standard definition" of the term at issue). Plaintiff should be held to its failure to "offer any theory in its briefs," its failure to "explain[]…the boundaries" of this term, and its failure identify support "in the record," such that this term should be deemed indefinite. *See id.*

## C.    '329 Patent[14]

Defendants propose four terms for construction from the '329 Patent: "abstract," "recall," "not used," and "section." The latter three terms appear in multiple elements and limitations of independent claims 1 and 8 as well as their dependents. In addition, all four terms appear together in one or more claim limitations. Therefore, for clarity and ease of review, Defendants addresses each of these terms in a separate section below, 1-4.  Construction of the term "document(s)" is addressed in section 5, below.

### 1.    "abstract" (claims 4, 11)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning. | "abstract" is "a short paragraph providing a concise description for a recalled document" |

The term "abstract" must be construed consistent with the patentee's own definition:

Search results returned by a search engine for a query contain **short descriptive paragraphs or abstracts for a recalled document**. Abstracts **provide a concise**

---

it was not. Moreover, that approach would contravene *Dow*, because it offers no principled basis to identify "the possible universe of methods"—otherwise, a patentee (including the patentee in *Dow*) could always avoid indefiniteness by saying "all possible methods," regardless of their (lack of) definite description in the intrinsic record. Not only does *Dow* prohibit that result—*Dow* found indefiniteness—but that result "does not adequately 'apprise the public of what is still open to them." *Semcon IP Inc. v. Huawei Device USA Inc.*, No. 216CV00437JRGRSP, 2017 WL 2972193, at *25 (E.D. Tex. July 12, 2017) (quoting *Nautilus*, 572 U.S. at 910). Finally, the definitions are often mutually-exclusive, such that a hodgepodge approach is no solution.

[14] Plaintiff asserts this patent against Deezer and Walmart.

**description** of the respective document.

'329 Patent at 4:54-60. This disclosure is a clearly stated, express definition. *See TF3 Ltd. v. Tre Milano, LLC,* 894 F.3d 1366, 1372 (Fed. Cir. 2018). The use of "or" in a parenthetical expression ("short descriptive paragraphs or abstracts") indicates the patentee's intent to equate those two concepts and use them interchangeably. *See Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1326 (Fed. Cir. 2009) ("The interchangeable use of the two terms is akin to a definition equating the two"); *Pactec, Inc. v. I.C.E. Packaging Co., LLC*, 2021 WL 5277131, at *12–13 (E.D. Tenn. Nov. 12, 2021) (finding that similar use of "or" to equate two concepts was clear lexicography). In *Pactec*, the disputed term, "coupling," was described in connection with a preferred embodiment:

> [The specification] evinces a clear intent to define the term "coupling" as "indirect attachment" … and further makes clear that "coupling" is a synonym for indirect attachment. Pactec demonstrates that indirect attachment and coupling are meant to be interpreted in the same manner in stating "[i]ndirect attachment, *or* coupling."

*Pactec*, 2021 WL 5277131, at *12. This Court should reach the same conclusion here and recognize that the patentee intended to equate "short descriptive paragraphs" with "abstract." The specification's next sentence further supports this conclusion (and is also incorporated into Defendants' proposed construction): "Abstracts provide a concise description of the respective document." '329 Patent 4:59-60. Contrary to Plaintiff's argument, this statement is entirely consistent with the preceding sentence, and does not suggest some alternative abstract. Indeed, disclosing an abstract that includes "short descriptive paragraphs" is wholly consistent with requiring the content of those paragraphs to "provide a concise description" of a recalled document.

Moreover, Defendants' proposed construction does not import a limitation from the specification—indeed, the cited paragraph is the only reference to the term "abstract" in the

description of the invention. Under settled Federal Circuit law, lexicography is lexicography, regardless of where it occurs. *Edwards*, 582 F.3d at 1334 ("Contrary to [the patentee's] argument, the location within the specification in which the definition appears is irrelevant.") (finding lexicography in description of a preferred embodiment); *Astrazeneca AB v. Mut. Pharm.*, 384 F.3d 1333, 1340 (Fed. Cir. 2004) ("[W]hile it is of course improper to limit the claims to the particular preferred embodiments described in the specification, the patentee's choice of preferred embodiments can shed light on the intended scope of the claims."). Here, as in *Edwards*, there is absolutely no textual indication that the definition of "abstract" is limited to a single embodiment. *See Edwards*, 582 F.3d at 1334.

To the extent Plaintiff contends that a single term or attribute of a document falls within the scope of the claimed "abstract,"—such as a title, for example—that flatly contradicts the specification. The '329 Patent Abstract states: "Terms in the no-recall sections are not used in **titles** **and** **abstracts** of the results" (emphasis added). Plainly, an abstract must be something more than a mere document title. Plaintiff's argument that an abstract may pertain to something other than a "recalled document" is also incorrect. The "abstract describing each document of **said plurality of documents**" in dependent claims 4 and 11 clearly refers back to the antecedents for "said plurality of documents" in claims 1 and 8, from which they depend: "**a plurality of documents** **recalled** by a search engine for a query…." Thus, the claims themselves use the term "abstract" only in the context of recalled documents. Without a construction from the Court, Plaintiff will ignore the patentee's lexicography and expand this term beyond the scope of the claims and the specification. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008); *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1318 (Fed. Cir. 2016) (reversing construction of "plain and ordinary meaning" where, as here,

parties dispute claim scope).

### 2.    *"recall" (claims 1, 4, 8, 11)*

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning. | "recall" is "generating results for a search engine query" |

The term "recall" has a specific meaning in the context of the '329 Patent. "[A] a patentee may choose to be his own lexicographer…as long as the special definition of the term is clearly stated in the patent specification or file history." *Boss Control, Inc. v. Bombardier Inc.*, 410 F.3d 1372, 1376–77 (Fed. Cir. 2005). Here, the specification provides an explicit definition of "document recall": "The inclusion of a document within the search engine results generated by a search engine for a search engine query **is referred to herein** as document recall." '329 Patent at 2:3–5 (emphasis added). This language indicates that the patentee "clearly express[ed] [an] intent" to define the term. *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008); *see also ArcherDx, Inc. v. QIAGEN Scis., LLC*, No. CV 18-1019 (MN), 2019 WL 6785546, at *4 (D. Del. Dec. 12, 2019) (finding that specification stating, "**As used herein**, the [disputed term] refers to…." provided "a clear definition and lexicography") (emphasis added). Defendants' proposed construction derives directly from the patentee's clearly expressed definition.

Defendants' construction is also supported by ample intrinsic evidence from the specification and the claims themselves. *See TF3 Ltd. v. Tre Milano, LLC,* 894 F.3d 1366, 1372 (Fed. Cir. 2018) (quoting *Edwards Lifesciences,* 582 F.3d at 1334 ("The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.")). First, every use of the term "recall" and its variants (e.g., "recalled," "no-recall") in the specification is consistent with the explicit definition of "document recall," and by extension, with Defendants' proposed construction. *See, e.g.*:

> The **terms inside no-recall sections** do not contribute to the document term frequency counts and **are not used for recalling the documents in response to**

> **search engine queries**. However the **<u>no-recall</u> sections** are included as input to
> forms of analysis of the document that affect, for example, the document's ranking.

'329 Patent at 3:17-20 ("Detailed Description of the Invention") (emphasis added). Second, the

term "recall" appears in both of the independent claims and is repeated in all but two of the

remaining 12 claims. In every instance, it refers to the process of generating search results in

response to a query—the end result of which is "a plurality of documents recalled by a search

engine for a query." '329 Patent at Claims 1, 8. Thus, Defendants' proposal is appropriate even

without lexicography because the specification and claims "reflect[] [the patentee's] consistent use

of the term" in a single sense. *See Nystrom v. TREX Co.,* 424 F.3d 1136, 1144-45 (Fed. Cir. 2005);

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.,* 262 F.3d 1258, 1271 (Fed. Cir. 2001)

("[W]hen a patentee uses a claim term throughout the entire patent specification, in a manner

consistent with only a single meaning, [it] has defined that term 'by implication'"). The patentee's

consistent usage is enough, standing alone, under *Nystrom* and *Bell Atlantic*—but that usage,

combined with its express definition, confirms a clear meaning for "recall."

Further, the definition of "recall" is essential to the meaning and scope of the alleged

invention. Specifically, the dichotomy between "recall" and "no-recall" sections of a document is

central to the process of ranking "recalled" documents, as described and claimed in the '329 Patent.

Without this distinction, the claims collapse into the known prior art:

> Moreover, Cutts fails to describe treating data in the noindex section **differently** for recall purposes than ranking purposes, as recited in Claim 1. Instead, Cutts describes treating data in the noindex section the **same** for both recall and ranking purposes. The table below illustrates the differences in the treatment of the data within a noindex tag for the search engines tested by Cutts and the treatment of the noindex sections recited by Claim 1.
>
> | Search Engine | Use noindex data for **recall**? | Use noindex data for **ranking**? | Difference Comparison |
> |---|---|---|---|
> | Google | No | No | No/No |
> | Ask | No | No | No/No |
> | MSN | Yes | Yes | Yes/Yes |
> | Yahoo! | Yes | Yes | Yes/Yes |
> | **Claim 1** | **No** | **Yes** | **No/Yes** |

Applicant's Jan. 4, 2010 Response to Final Office Action dated Nov. 9, 2009 at 8 (distinguishing claim 1 over the prior art to overcome rejection, on the basis of differentiating ranking and recall).

Plaintiff concedes that the "description" of document recall "may very well provide context for a POSA to consider when arriving at the plain and ordinary meaning of the term 'recall.'" Br. at 32. But Plaintiff disregards the patentee's clear lexicography because, according to Plaintiff, it pertains to a "different term." *Id.* That is disingenuous. First, the exact word pair "document recall" does not appear in the claims at all, and therefore cannot be a "different term" from "recall." *Cf.* '329 Patent at Claim 1 ("…a plurality of **documents recalled** by a search engine…"). Second, as detailed above, the specification's express definition of "document recall" is consistent with every reference to "recall" throughout the patent as a whole. The '329 Patent does not describe, disclose, or even contemplate any other type of "recall." Plaintiff's characterization of the proposed construction as "limiting" is therefore nonsensical and should be rejected.

Accordingly, the Court should construe "recall" to mean "generating results for a search

engine query" and prevent Plaintiff from expanding this term beyond its proper scope.[15] *See TF3*, 894 F.3d at 1372-73 ("It is not reasonable to read the claims more broadly than the description in the specification, thereby broadening the claims to read on the prior art over which the patentee asserts improvement."); *Eon Corp.*, 815 F.3d at 1318 (reversing construction of "plain and ordinary meaning" where, as here, parties dispute claim scope).

### 3.    *"not used" (claims 1, 4, 8, 11)*

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning. | "not used" is "ignored" |

A person of ordinary skill in the art would understand the phrase "not used" in the '329 Patent to mean "ignored." The word "ignored" appears throughout the specification interchangeably with "not used":

> In examining the various sections, **the crawler identifies sections <u>to ignore, that is, to not index</u>** in search engine indexes and <u>**or otherwise use for recalling**</u> the documen**t**. Such sections are referred to herein as "no-recall sections." Those portions that are indexed for recalling are referred to as recall sections. In an embodiment, **a crawler ignores no-recall sections demarcated by, for example, a tag**. In another embodiment a no-recall section may be identified by analyzing section content rather than examining only delimiters.

'329 Patent at 3:9-15 (emphasis added); *see id.* at 3:55-60, 4:1-9. As an initial matter, "[t]he interchangeable use of the two terms is akin to a definition equating the two." *Edwards Lifesciences*, 582 F.3d at 1329. Moreover, in addition to using the phrases interchangeably, the specification underscores expressly uses the phrase "that is" to equate "to ignore" and "to not....use for recalling." *TF3*, 894 F.3d at 1372 (construing "that is" as a phrase that "signals an intent to define"). Finally, the description of "sections to ignore" directly corresponds to the

---

[15] While Defendants submits that its proposal fairly captures the lexicography in the specification in simple and concise fashion, to the extent the Court is inclined to track the lexicography exactly*,* Defendants does not object to a construction of "recall" that does so—i.e., "the search engine results generated by a search engine for a search engine query" rather than Defendants' proposed "generating results for a search engine query."

"seciont[s]…not used" in the claims. For example, Claim 1 recites "at least one **section that is not used** by said search engine **for recall.**" 329 Patent at 7:5-10 (emphasis added); *cf.* '329 Patent at 3:9-15 ("<u>**sections to ignore, that is, <u>to not</u>** index in search engine indexes and or otherwise <u>use for recalling</u></u>")**.**

Defendants' proposed construction also resolves a potential ambiguity in the claims by clarifying that "not used" is more than a simple omission from consideration by the search engine.[16]  Instead, the claims require an affirmative act—a specific designation of sections whose contents will not be indexed for purposes of recall, but will be analyzed for purposes of ranking. For example, both independent claims specify that ranking documents recalled by a search engine query must be "based, at least in part" on "at least one section" of those documents that was "not used…to recall documents." '329 Patent at Claims 1, 8. In other words, a section that is "not used" for any purpose, including recall and ranking, does not satisfy the claims. *See supra* at Section III.C.2. Indeed, the '329 Patent teaches that identification of these no-recall sections may be accomplished through HTML tags such as "<div class= 'robots-noindex'>," which "causes content therein to be ignored for purposes of recalling the document." '329 Patent at 3:55-57. Thus, construction of "not used" as "ignored" captures the active identification of no-recall sections that is required by the claims, reinforcing their proper meaning and scope. *Eon Corp.*, 815 F.3d at 1318

---

[16] Plaintiff suggests that Defendants' construction of "not used" creates inconsistency with the word "used." Not so. In context of the specification, both terms remain clear about the role required for "use." For example, claim language providing that "at least one section is **not used** by said search engine for recall" is understandable, in light of the specification, as "at least one section **whose contents are ignored** for generating results for a search engine query." Conversely, claim language providing "one or more sections **that are used** by said search engine for recall" would be understandable as "one or more sections **whose contents are used** for generating results for a search engine query" in context of the specification. Thus, effectuating the guidance of the specification for "not used" would not confuse application of the plain meaning of "used" in context, for the remainder of the claims, as laid out immediately above.

(reversing construction of "plain and ordinary meaning" where, as here, parties dispute claim scope).

### 4.    "section(s)" (claims 1, 4, 8, 11)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning. | "section" is "defined portion within the structure of a document" |

The term "section" should be construed as a "defined portion within the structure of a document." The identification of sections within the overall structure of a document is a critical aspect of the '329 Patent's claimed invention, which is titled "Method for Improving Quality of Search Results By Avoiding Indexing Sections of Pages." As explained in the Abstract, "The method works by **delineating sections of a document** that are not relevant to the main content." '329 Patent at Abstract (emphasis added). Throughout the remainder of the specification, the patentee uses similar language to describe identification of sections within a document's structure:

- "A solution that could address this need [to defeat search engine spamming] is to allow a webmaster to **designate** what sections of the page should not be indexed." '329 Patent 2:31-33 (emphasis added);
- "The **layout and basic structure** of a web page presented in FIG. 1 could have **an HTML code implementation structure** as illustrated in FIG. 2. **A[n] [HTML] tag is used to delimit the no-recall sections** of web page….The **tag delimits** the copyright notice…, navigation pane section…, related blogs…and ad section …." '329 Patent 3:41-43, 3:51-55 (emphasis added);
- "FIG. 3 is a flow diagram of a procedure for **determining** whether a section of a document is a no-recall section according to an embodiment of the present invention. Referring to FIG. 3, at step 301, the HTML code of **a document is parsed to determine various logical sections** in step 302" '329 Patent 4:17-21 (emphasis added).

Thus, Defendants' construction is entirely consistent with the specification and the purpose of the claimed invention. Figures 1 and 3 further bolster the construction of "section" as a defined, structural portion of a document, such as a webpage.



Figure 3.



Figure 1.

'329 Patent at Figs. 1, 3. In context, these disclosures are "the single best guide to the meaning of [this] disputed term." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996); *see also Astrazeneca*, 384 F.3d at 1340 ("[T]he patentee's choice of preferred embodiments can shed light on the intended scope of the claims.").

Finally, Defendants' proposed construction is not only correct, but also necessary in light of the structure of the claims. For example, a search engine may be designed to ignore certain commonly-used noisewords (e.g., articles such as "a," "an," and "the," or prepositions such as "of," "on," "for," etc.) when generating results in response to a query. But that does not mean these words constitute individual no-recall "sections" in the context of the '329 Patent. Rather, a section must be some defined portion within a document's logical structure. Critically, Plaintiff identifies no disclosure in the specification that is contrary to or inconsistent with Defendants' proposed construction. Thus, Defendants' construction aligns with the intrinsic record while also preventing Plaintiff from asserting an a-textual reading of the term "section." *Eon Corp.*, 815 F.3d at 1318

- 45 -

(reversing construction of "plain and ordinary meaning" where, as here, parties dispute claim scope).

### 5.    *"document(s)" (claims 1, 4, 5, 8, 11, 12)*

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "any unit of information that may be indexed by search engine indexes" | No construction necessary. To the extent a construction is necessary, the construction should include the full description:<br><br>"A document is any unit of information that may be indexed by search engine indexes, which are described below. Often a document is a file which may contain plain or formatted text, inline graphics, and other multimedia data, and hyperlinks to other documents. A document may conform to XML (Extensible Mark-up Language, as promulgated by the WorldWideWeb Consortium), HTML (Hypertext Markup Language), or other public or private standard (e.g. PDF, Portable Document Format by AdobeTM, MS Word by MicrosoftTM). Documents may be static or dynamically generated." |

The term "document(s)" requires no construction and should be given its plain and ordinary meaning. Here, a POSA would understand the context of the claimed "document" through its preferred embodiment—a webpage—and its only other disclosed embodiment, a file formatted in a standard format such Adobe PDF and Microsoft Word. *See* '329 Patent 1:32-44; *id.* at Figs. 1-3 and accompanying text; *id.* at 1:17-31 (defining "search engine"); *id.* at 1:45-59 (defining "search engine index").

Defendants agree with Plaintiff that the sentence "A document is any unit of information that may be indexed by search engine indexes, which are described below" indicates an intent to define the term "document" as such. *See* '329 Patent at 1:33-34. Critically, Plaintiff's reliance on the term "is" to demonstrate lexicography and a definition proves fatal to its opposition to many other terms Defendants propose for construction, which also rely on the term "is" to demonstrate lexicography and a definition. *See, e.g.*, "Abstract," Section III.C.1; "Recall," Section III.C.2; "not

used," Section III.C.3; "intents," Section III.B.1. However, Plaintiff's proposed construction omits the preceding sentence of the specification, which is also phrased as part of the definition: "The information resources searched by search engines **are referred to herein as documents**." *Id.* at 1:32-33 (emphasis added). Plaintiff's proposal also omits the final parenthetical of the second definitional sentence, "[search engine indexes] **which are described below**," ignoring any impact that the patentee's cross-reference to its own definition of "search engine indexes" has on the meaning of the term "document(s)." *Id.* (emphasis added).

In short, Plaintiff's proposed construction should be rejected because it injects ambiguity and risks jury confusion as a result of its partial omission of the full definition of "document" given by the patentee. Moreover, Plaintiff has not identified any dispute between the parties with respect to the meaning of this term that requires construction by the Court. To the extent there is a need to construe this term, though, the Court should give full effect to the patentee's lexicography rather than the partial proposal submitted by Plaintiff.

**D.    '317 Patent[17]**

**1.    "*partial query*" (Claims 1, 2, 8, 12)**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "any abbreviated or incomplete search query such that the submitted query is not fully representative of the entire search query desired by the user." | "a shorthand way of expressing a typical search query" |

This is the only disputed term in the '317 patent that the Plaintiff agrees has no plain and ordinary meaning.  The Plaintiff offers a definition for "partial query" that is already recited in a "wherein clause" in the same claims.  But as discussed below in the next section, that recited claim language also requires claim construction – and it renders the claim indefinite.  Deezer's proposed

---

[17] Plaintiff asserts this patent against Deezer S.A. only.

construction is simpler and clearer for a jury to understand and is directly supported by the '317 specification.

The '317 patent purports to solve a problem that occurs when a user submits a request into a search engine that is only a "partial query."  Throughout the patent, the specification contrasts a "partial query" (that a user might submit to the search engine) with a "full query" (that the search engine uses to perform a search).  According to the Abstract, the '317 patent provides a "flexible way" for users to submit a "partial query" and then have a search engine "reconstruct a full query based on the partial query" and perform a search.  '317, Abstract.  The Brief Summary section additionally provides that "[t]he method may include receiving a first set of information indicative of a partial query, determining a full query based on the partial query, [and] submitting the full query to a search engine …."  *Id,* 1: 60-64.  The Detailed Description section provides that: "a full search query may be represented by a multitude of partial search queries" (*Id,* 3: 19-20) and describes steps that "determine a full query that matches the partial words specified in the partial query"  *Id.*, 3: 34-38.

The specification notes that when a user submits a "partial query," that submission is "abbreviated or incomplete," such that it is "not fully representative of the entire search query desired by the user." *Id.*, 3: 13-15.  In the next sentence, the '317 patent clarifies this by explaining: ***"In other words, partial search queries are shorthand ways of expressing typical search queries."***  *Id.*, 3: 15-17.  Thus, it can be understood that when a user submits a query using shorthand, that is a partial query.  The objective of the patent is to reconstruct the shorthand input into a full query.

In every example provided in the '317 patent, the query that the user provides as a "partial query" is a shorthand way for expressing well-known, popular subject matter that others have been

commonly requesting (as a "full query"). Particularly, the '317 patent describes that "a i" can be a partial query that may be used to represent full search queries "American Idol" or "auto insurance." *Id.*, 3: 17-19. The partial queries "a ins," "auto ins," or "a insurance" also can represent "auto insurance." *Id.*, 3: 20-23. The partial query "w c s[oc].*" can match the full queries "world cup soccer," "world cup schedule," or "world cup scores." *Id.*, 3: 23-26. As can be appreciated, "a i," "a ins," "w c s[oc].*" are all shorthand.

The '317 patent term "partial query" is not an established term of art. The patent provides two explanations for the term. The Plaintiff argues that its own construction is a "definition" whereas Deezer's proposed construction is the "cumulative explanation of the definition." Plaintiff's Br. at 35. But regardless of whether one or both proposed constructions are "definitions," the '317 patent started the sentence containing Deezer's construction with "[i]n other words …" because the inventors were providing the meaning for "partial query" that would be better understood by all. It is therefore not surprising that it is clearer, more concise, and is consistent with the specification. Accordingly, it is preferable for the Court to define a "partial query" as being "shorthand" and to separately construe the language in Plaintiff's proposed construction, which is recited elsewhere in the claim.

> **2.    *"… not fully representative of an entire search query desired by the user" and "… better representative of the entire search query desired by the user" (Claims 1, 8)***

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite |

The asserted claims of the '317 patent are indefinite as ambiguous because they recite limitations pertaining to the indeterminable, subjective intent of a person. As discussed below, Plaintiff has been on notice and has waived any right to oppose Deezer's position. *See infra* Section III.G.

The claim language runs afoul of 35 U.S.C. § 112(2) because it does not inform a person of ordinary skill as to the scope of the invention with reasonable certainty.  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).  Terms that depend "on the unpredictable vagaries of any one person's opinion" are indefinite.  *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350-51 (Fed. Cir. 2005).

Claim 1 recites a "wherein clause" that reads:

> wherein the submitted partial query comprises an abbreviated or incomplete search query which is ***not fully representative of an entire search query desired by the user*** and the full query is ***better representative of the entire search query desired by the user***.

'317, 6: 34-38 (emphasis added).  Claim 8 is a method claim reciting the same two phrases about what might be "desired by the user."  *Id.*, 7: 28-29, 31-32.  According to this claim language, a computer has to determine (i) whether the inputted search query is not the one that this particular user really wanted the search engine to use and also (ii) whether the computer determined a search query that is "better" to the user than the one that he or she inputted.  Thus, to perform the recited limitations in the wherein clause, the computer somehow must read the user's person's mind – twice.

The '317 patent specification provides no help for interpreting the claim.  As discussed above, the wherein clause simply repeats the same language from the specification about being "not fully representative" of what the user desired.  '317, 3: 13-15 ("… any abbreviated or incomplete search query such that the submitted query is not fully representative of the entire search query desired by the user.")  The specification provides no disclosure about what is "better representative" of what the user desired.

Courts have invalidated claims for indefiniteness because of language much less ambiguous than that recited in claims 1 and 8 of the '317 patent.  In *Intellectual Ventures, LLC v.*

*T-Mobile USA, Inc. et. al*, 902 F.3d 1372 (Fed. Cir. 2018), the Federal Circuit found claim language reciting "allocating means for allocating resources … so as to optimize end user application IP QoS requirements" to be indefinite because it is "entirely subjective and user-defined."  In *Cypress Lake Software Inc. v. Samsung Electronics America, Inc.*, 382 F. Supp. 3d 586 (E.D. Tex. 2019), the court found the language "permits a user to conveniently enter" to be indefinite because it failed to provide an objective criterion and depends on the personal preferences of the specific user.  In *Ave. Innovations, Inc. v. E. Mishan & Sons Inc.*, 310 F. Supp. 3d 457, 463-64 (S.D.N.Y. 2018), the court invalidated two claims reciting "operative position most convenient to the user" as indefinite, finding that the claims "do little to set objective boundaries on the 'operative position' phrase."

The ambiguity in claims 1 and 8 of the '317 patent is especially significant because they require that the computer make determinations according to the user's unknown, yet subjective desires.  How is the computer to know whether the "full" search query is "better representative" of the search that the user desired to have performed than the user's inputted text?  While it perfectly acceptable to claim that a computer makes determinations based on statistical models or databases of others' prior search queries, etc., "[i]t is well established that the meaning of a claim limitation 'cannot depend on the undefined views of unnamed persons'".  *Cypress Lake Software, Inc.*, 382 F. Supp. 3d at 609-10.  Claims 1 and 8 fail to inform about the claim scope with reasonable certainty and are therefore invalid.  *Nautilus*, 134 S.Ct. at 2129.

### 3. *"query reconstruction server … operative to receive a partial query submitted at a remote user client system … and … determine a full query" (Claims 1, 2)*

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | 112(f) / Indefinite |

The claimed phrase "query reconstruction server … operative to receive … and determine"

is a means-plus-function limitation subject to 35 U.S.C. §112(6) without sufficient corresponding structure disclosed in the '317 patent specification.  A server is a generic computing apparatus and and "query reconstruction" is purely functional terminology.   Taken together, a "query reconstruction server" is a nonce word devoid of structural meaning, and the '317 patent discloses nothing but a generic black box.

As a first matter, the claimed phrase should be evaluated as a means-plus-function term because the claim language alone would not be understood by a person of ordinary skill to denote particular structure.  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) ("[O]ur cases have emphasized that the essential inquiry is not merely the presence or absence of the word 'means' but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure.").  The claimed phrase describes the generic computing machine by stating what it does (i.e., query reconstruction … to receive … and determine) rather than what it is.

The Plaintiff cites cases for the principle that claiming a "server" is structural and therefore not a means-plus-function claim element.  Br. at 37.  Deezer readily acknowledges that a "server" is well-understood to be a generic computing device that communicates with client devices, but the claimed "query reconstruction server" is a computer-implemented functionally-delineated limitation.  Plaintiff argues that "query reconstruction" is just an "adjectival qualification" that does not make the structure "any less sufficient for purposes of § 112, ¶ 6.  (Pl's Br. at 37-38, citing *Personalized Media Communications, LLC v. ITC*, 161 F.3d 696, 705 (Fed. Cir 1998).  But the *Personalized Media* decision that Plaintiff relies upon pertained to a claimed "digital detector," which is an off-the-shelf product.  One cannot order a "query reconstruction server" from a catalog. In this manner, the claim term is no different from a "server-side application," which this Court

held to be governed by § 112, ¶ 6.  *CXT Sys., Inc. v. Academy, Ltd.*, No. 2:18-cv-00171-RWS-RSP, 2019 WL 4253841, at *15 (E.D. Tex. Sept. 6, 2019).

The claim fails to recite the "objectives and operations" of the limitation such that the structure is apparent from the claim language.  *Id.* at *15.  The claim indicates that "query reconstruction server" will "determine a full query" but does not recite the operations to be performed to accomplish that.  Rather, claim 1 merely recites that the full query will be determined based upon "a received partial query" and "information stored in the database."  The claimed phrase merely concludes that it is "operative" to perform functions, instead of actually reciting any of those operations.

Plaintiff cites to Figure 3 of the '317 patent for disclosing corresponding structure for a "query reconstruction server," but this shows nothing but a generic black box.  The '317 patent fails to disclose any particular configuration for the server.  Moreover, the Plaintiff's brief fails to point to any algorithm in the specification,[18] let alone one that is sufficient to perform the claimed function.  *See WMS Gaming Inc. v. Int'l Game Tech*, 184 F.3d 1339, 1349 (Fed. Cir. 1999); *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).  Plaintiff was waived any argument that the specification discloses an algorithm as the corresponding structure.

Accordingly, this Court should find that the "query reconstructive server …" phrase is indefinite for reciting a means-plus-function limitation without corresponding structure.

---

[18] FIG. 2 of the '317 patent shows a single step 220, "Reconstruct Full Query," rather than depicting and describing a step-by-step algorithm to achieve the claimed functionality.

### E.    '279 Patent[19]

#### 1.    *"streaming appliance computing device" (Claims 1-3, 7)*

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a device capable of streaming a media file" | "an electronic device with the single or limited purpose of streaming media objects" |

The '279 patent, titled "Media Device and User Interface for Selecting Media," pertains to a simplified user interface that can be implemented in certain types of media devices.  The '279 patent is a continuation of an application filed in 2005.  The patent describes that some types of media devices that existed at the time, such as portable MP3 players, had a very small display which made it difficult for users to select what song to play.  '279, 1:48-50.  According to the '279 patent, the device can connect to a server to receive media files (songs) and also information about the "relationship" between different songs.  '279, 6: 18-23, 32-35.  For example, songs can be grouped by genre, musical artists that have the same style, etc.  '279, 7: 29-64.  The '279 patent claims pertain to a method and system in which a user can use the user interface on a certain type of media device to easily skip to a different song according to its "relationship" with the song being played.

The specification of the '279 patent discloses four embodiments, each concerning a different type of media device and how that device is connected to servers and other devices.  The four different types of media devices are:  (1) Portable Media Device (e.g., MP3 players such as the Apple iPod); (2) Personal Computer Media Device (e.g., Windows Media Player); (3) Media Appliance Exemplary Embodiment (e.g., Netgear digital multimedia receiver); and (4) Streaming Media Appliance (e.g., Philips Streamium).  '279, 6: 15, 9: 1-2, 10: 50, 12: 15.

The '279 patent repeatedly distinguishes between a "personal computer media device" and

---

[19] Plaintiff asserts this patent against Deezer S.A. only.

a "streaming media appliance."  In Figure 8, element 805 is a "Personal Computer or Streaming Appliance."  In the flow diagram of Figure 9, steps 900, 910, 915, 920, and 930 are performed by a "PC or Streaming appliance."  The '279 patent also distinguishes "streaming appliances," which include "Philips Streamium" (see Exhibit 14 (https://www.usa.philips.com/c-p/WACS7500_37/streamium)) from "PC based streaming applications," such as "Real Rhapsody" (See Exhibit 15 (https://www.billboard.com/music/music-news/musicmatch-bows-on-demand-sub-service-1432880/)) '279, 12:23-29.

According to the Microsoft Computer Dictionary, an "appliance" is "a device with a single or limited purpose with functionality … similar to a simple consumer appliance."  Exhibit 16.  A streaming appliance is therefore a device with a single or limited purpose of streaming music.  This stands in contrast with a personal computer, which can perform an unlimited number of functions.  A PC based streaming application is software that runs on a personal computer.

Claim 1 recites a method that includes a step of "establishing a streaming media connection between a media server computing device and *a streaming appliance computing device* for streaming a first media object to *the streaming appliance computing device* for consumption by a user."  '279, 28: 7-12.  The "streaming appliance computing device" is not just any device capable of streaming a media file, but rather, it is a single or limited purpose device that does this.

### 2.    *"single-action user input" (Claims 1-3)*

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "indicia from a user constituting a single keystroke, button press, dial rotation, or icon selection on a user interface, without navigation" |

Claims 1-3 of the '279 patent each recites a step in which there is a "single-action user input" from the streaming appliance that provides two indications to a media server.   "Single-action user input" is not a term of art and requires explanation from the '279 patent specification

to arrive at its proper meaning.  Taken in proper context, a "single-action user input" pertains to a way for a user to operate a streaming appliance quickly, without having to navigate through a complicated user interface.

As described above, the Background section of the '279 patent describes that some types of conventional media devices, such as portable MP3 players, had a very small display which made it difficult for users to select what song to play.  '279, 1: 48-50.  The patent noted when "[j]oggers and those operating exercise equipment" used portable media players, they could have difficulty "manipulating playlists and choosing an artist, album or track from hundreds or thousands of choices."  '279, 1: 56-65.  It is further described that using media players in cars can be "downright dangerous" unless the user just passively listens to a pre-programmed playlist.  '279, 1: 65 – 2: 2.

To solve this problem, the '279 patent describes a configuration in which a user can press just a single button on the user interface and that will cause new music to play.  Pressing that single button will cause the media player to retrieve another song that is at a certain level of similarity to the song that is currently playing, and the media player will skip to that next song.  '279, 19: 58 – 20: 6.  The patent describes that different songs have a relationship to each other, such as similar genres or artists that play similar music.  That media server that receives the user's request from the media player will use that relationship (e.g., a related artist) to select the next song.  '279, 17: 3-8.

Figure 18 of the '279 patent depicts a simple user interface that has only a few buttons, specifically a wheel, a fast forward button, a rewind button, and a play button.

- 56 -



For convenience and safety, the '279 patent describes pressing just a single button to skip to the next song of a similar genre, without the distractions that result from having to navigate through any menus or levels while exercising or driving. '279, 25: 57 – 26: 7.

Plaintiff cites to relevant disclosure from the '279 patent that mentions how a device with a "single user input" can be used, in which "the entire user interface could comprise a skip button or icon." '279, 26: 52-56. Plaintiff also quotes from an example in which a "next" playback button is pressed and in response "the channel will change to a television program which is very similar to the previous television program." '279, 27: 11-21. The patent also describes that a user can press and hold a button (for at least one second) to indicate a "big skip" to a different song having a certain "relationship level" with the previous song. '279, 25: 57 – 26: 7.

Notwithstanding the patent's disclosure, Plaintiff urges the Court to 'skip' construing "single-action user input" by saying that it just means an input that 'involves' a single action. But when a user operates an electronic device, there is always some final, "single" action that causes something to happen. For example, to perform a search on a search engine, a user may type "Google" into a browser, then type a query, and finally hit "enter" to run the search. Is hitting "enter" a "single-action user input" to operate the search engine? As another example, if a user navigates a car infotainment screen by selecting "Media," then "XMSirius," then "Channel," is the

"Channel" selection a "single-action user input"?

Deezer's construction is consistent with the '279 patent disclosure and clarifies that a "single-action user input" cannot simply be the last in a series of steps. A single-action user input does not involve navigating one's way through a user interface or pressing multiple buttons or keystrokes. Rather, it is the indicia by a user from a just single keystroke, button press, dial rotation, or icon selection on a user interface, without performing any navigation of the user interface.

**F.    '011 Patent[20]**

**1.    *"a link from a portal" (claim 7) / "each link from the portal" (claim 9)***

| Plaintiff's Construction | Defendants' Construction[21] |
|---|---|
| "a link from a service that stands between the user and another service to perform an added value" / "each link from the service that stands between the user and another service to perform an added value" | "a URL on the portal site that references a page on the institution's site" |

Defendants' proposed construction of the terms "a link from a portal" and "each link from the portal" in asserted claims 7 and 9 of the '011 Patent comes directly from the specification, which describes such a link as "a URL on the portal site that references a page on the institution's site." *See, e.g.*, '011 Patent at 5:47–50. Plaintiff's proposal seeks to unnecessarily construe "portal" while ignoring the '011 Patent's express disclosures regarding what constitutes "a link from a portal." *Cf.* Br. at 44.

---

[20] Plaintiff asserts this patent against Schwab and JPMorgan.
[21] Defendants agree with Plaintiff that the term "each link from the portal" in claim 9 refers to the respective "link from the portal" for each of the "plurality of different users" recited in the claim. As explained with respect to the term "a link from a portal" from claim 7, however, Defendant's position is that "each link" is "a URL on the portal site that references a page on the institution's site," whether the claim recites a singular user and link or a plurality of users and links.

As the specification makes clear, a "link on the page of a portal web server *is* a URL." '011 Patent at 5:47–50.[22]  And a "link from a portal" refers to a specific URL:  "a URL ***referencing*** a page on the financial institution's site" that "includes the user's portal ID in the URL."  *Id.*  The specification further explains that a sample "URL referencing a page on the financial institution's site and [that] includes the user's portal ID in the URL," passes a user "to the financial institution site" and "pass[es] information about the [user's] portal longer User ID to the financial institution[]."  *See id.* at 5:44-50, 7:35–38.  This "example URL format is a GET request to https://yahoo.<fin-inst>.com/signup?c=0000483729012johnb%2fy&p=yahoo," and the link includes the user's portal ID—e.g., "johnb."  *Id.* at 8:14–19.

Moreover, the '011 Patent's specification does not describe "a link" as anything other than "a URL."  Although "particular embodiments appearing in the written description will not be used to limit claim language that has broader effect," claims may be read restrictively where "patentee has demonstrated a clear intention to limit the claim scope using 'words or expression of manifest exclusion or restriction.'"  *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004).  Here, the '011 Patent's specification expressly states that a "link on the page of a portal web server *is a URL*."  '011 Patent at 5:47–50; *see Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007) (explaining that "the word '*is*' . . . may 'signify that a patentee is serving as its own lexicographer[,]' [and a]s such the patentee must be bound by the express definition" (internal citations omitted)); *cf. Lectec Corp. v. Chattem, Inc.*, No. 5:08-cv-130-DF, 2010 WL 10861324, at *12 (E.D. Tex. May 20, 2010) (finding that "'i.e.' signals an express definition").

Aside from citations that refer to a process for linking a user's portal and financial accounts,

---

[22] All emphasis added unless otherwise indicated.

the citations that Plaintiff identifies as purportedly "discuss[ing] a 'link' in a much broader sense at multiple places in the specification" do not provide any disclosure of a "link from a portal" beyond "a URL." *See id.* 5:40–62 ("A link on the page at the portal web server ***is a URL*** referencing a page on the financial institution's site…."), 6:5–17 (describing "a link to [a] detailed product offering" without providing a non-URL example); 7:4–15 (describing a "'Refresh' link" without providing a non-URL example), 7:35–8:19 (describing a "'Sign me up!' link" that passes a user and the user's information to a financial institution using an example of an URL); *see also id.* at Abstract (discussing "link[ing] [a user's] portal account and user account with the financial institution" and communication links between a portal and financial institution), 7:50–60 (describing linking/associating user accounts); *cf.* Br. at 45. As such, the '011 Patent's written description expressly limits "a link" to a URL.

Unlike Defendants' proposed construction, which is grounded in the specification (*see, e.g.*, '011 Patent at 5:47–50), Plaintiff's proposed constructions—which inject the ambiguous concept of "perform[ing] an added value" (Br. at 44–45)—are unnecessary and unhelpful to the jury. Even if the sub-term "portal" needed construction—and Defendants contend it does not given the context provided by the '011 Patent's specification and claim 7—Plaintiff's convoluted construction, which introduces "perform[ing] an added value" to the claims, is ambiguous and would require further explanation. *See MicroUnity Sys. Eng'g, Inc. v. Acer, Inc.*, No. 2:10-cv-91-LED-RSP, 2013 WL 866469, at *5 (E.D. Tex. Mar. 7, 2013) (finding that "including 'core' in the construction [of 'multi-precision execution unit'] would introduce ambiguity and juror confusion" because "neither party is able to give a clear definition of what the term 'core' means, or can explain how the jury should properly apply the term if included in the construction"). While the '011 Patent may discuss "aggregation, presentation, reformatting or transport of data" as examples

of the alleged "added value," the term is not limited to such examples, and including "added value" in the construction of "a link from a portal" would not provide a jury with an explanation for or understanding of the scope for the "added value" term.  Moreover, the context provided by the surrounding language of claim 7 demonstrates that "a link from a portal" focuses on the "link" rather than the "portal."  Indeed, the clause following the term "a link from a portal" recites "*the link* including a user identification."  *See id.* at Claim 7; *see also id.* at claim 9.  Since claims 7 and 9 and the disputed term focuses on the scope of "a link" rather than on the scope of "a portal," Plaintiff's additions are unnecessary and unhelpful in the context of the asserted claims.

Because the intrinsic record limits "a link" to "a URL" and Plaintiff's construction of "portal" is not helpful to the jury, the Court should reject Plaintiff's proposal and construe the terms "a link from a portal" and "each link from the portal" as "a URL on the portal site that references a page on the institution's site."

> **2.**    **"a user identification" (claim 7) / "respective user identifications" (claim 9)**

| Plaintiff's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning. | "user-specific portal authentication data that authenticates the user to the portal" |

Defendants' proposed construction comes directly from the '011 Patent's specification and ensures that the scope of "user identification" is consistent with the intrinsic record.  *See* '011 Patent at 4:32–34 ("[A] user will have *user-specific portal authentication data* (PAD) *that authenticates the user to the portal*.").  The '011 Patent's specification expressly delineates the types of identifying data that do and do *not* constitute "a user identification" within the context of the patent.  *See*, *e.g.*, '011 Patent at 4:32–53.  In advocating for plain and ordinary meaning, Plaintiff focuses exclusively on claim differentiation, while improperly disregarding the important context provided by the intrinsic record.  *See Barkan Wireless Access Techs., L.P. v. Cellco P'ship*,

No. 2:16-cv-293-JRG-RSP, 2017 WL 2099565, at *3 (E.D. Tex. May 14, 2017), *aff'd*, 748 Fed. App'x. 987 (Fed. Cir. 2018) (explaining that "[c]laims 'must be read in view of the specification, of which they are a part[]' . . . . because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope" (internal citations omitted and quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315, 1316 (Fed. Cir. 2005))).  But even if claim differentiation applied here—and it does not—the "doctrine cannot be used to make a claim broader than what is contained in the written description." *See Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1446 (Fed. Cir. 2000); *Danco, Inc. v. Fluidmaster, Inc.*, No 5:16-cv-73-JRG-CMC, 2017 WL 4225217, at *7 (E.D. Tex. Sept. 22, 2017) ("[T]he presumption of claim differentiation may be rebutted where the patent discloses only one embodiment, and that single embodiment is all the inventors conceived of.").

The '011 Patent explains that, in the context of the claimed invention, it is necessary "[t]o distinguish [between] various authentication data" (particularly in contrast to prior-art systems), and sets forth three categories of authentication data that are used by systems described by the '011 Patent:  (1) portal authentication data ("PAD"), (2) financial authentication data ("FAD"), and (3) "portal financial authentication data ("PFAD").  *Id.* at 4:43–53.  In arguing that there need not be a "relationship between the 'user identification' and the 'portal,'" *cf.* Br. at 47, Plaintiff effectively contends "user identification" should be interpreted broadly enough to encompass all three types of authentication data.  But that interpretation is contrary to both the structure of Claim 7 and the '011 Patent's intrinsic record.

Claim 7 recites "accepting a connection at an institution server, the connection initiated by a user following a link from a portal, the ***link including a user identification***" and "responding to the authentication by associating ***the user identification*** with the portal."  '011 Patent at Claim 7.

- 62 -

Thus, the claim itself establishes a relationship between the "user identification" and the "portal" because it requires that the recited "link from the portal" "includ[e] a user identification," and further recites that, in response to authentication of the user, the "user identification" is "associat[ed] . . . with the portal." *See id.* The '011 Patent's specification explains that, of the three types of authentication data discussed above, only "PAD *refers to authentication data needed by the user to access the portal's services*." *Id.* at 4:43–49.

Consistent with this explanation in the specification, during prosecution of the '011 Patent, the Applicant argued (directly for claim 1 and referentially for claim 7) that the claimed "link from" or presented by a portal "provides to the institution server an *identification of the user at the portal server*"—*i.e.*, PAD. *See* Ex. 17 (Apr. 30, 2007, Office Action Response), at 9; *see also id.* at 11 (arguing that "[C]laim 26 relates to an institution method that would *correspond with the portal system of claim 20*"); Ex. 18 (Aug. 20, 2007, Issue Classification) at 1 (corresponding prosecution claims 20 and 26 to issued claims 1 and 7, respectively).

In contrast, the specification and the prosecution history demonstrate that the other two types of authentication data—PFAD and FAD—are not the claimed "user identification." The specification explains that PFAD "refers to *authentication data needed by the portal* to access the financial institution's services on behalf of one or more portal users," which includes a portal's username(s) and password(s). *Id.* at 4:45–49, 8:48–52, 11:56–59. Since PFAD *identifies a portal* to a financial institution, it does not identify a user and, therefore, cannot be the "user identification" recited in claim 7. *See id.* at claim 7.

Additionally, FAD "refers to authentication data needed by the user to access the financial institution's service." *Id.* at 4:45–49. Although FAD may include user identification information relevant to the financial institution (e.g., a user's financial institution username(s), password(s),

and account number(s)), *see id.* at 1:63–65, 10:64–67, the '011 Patent's prosecution history demonstrates that FAD is not the claimed "user identification."  During prosecution, the Applicant clearly and unmistakably disclaimed any reading of claims 1 or 7 where the portal has access to or knows a user's FAD.[23]   *See* Ex. 17 (Apr. 30, 2007, Office Action Response), at 10–11. Specifically, when distinguishing FAD and PFAD, Applicant explained that "the portion of a ***portal provider*** accessing user information at an institution, ***according to the present claims, should not possess sufficient authentication information to 'stand-in' for a user***"—i.e., the portal cannot possess FAD.  *See id.* at 10.  Indeed, the prosecution history is adamant that, unlike the cited prior-art, the method of claim 7 "authenticates a portal to receive user data at an institution ***without providing user-institution authentication data to the portal system***."  *See id.* at 11.  Since the claimed portal does not possess FAD, claim 7's "link ***from a portal*** . . . [that] ***include[s] a user identification***" cannot include FAD as "user identification."  *See* '011 Patent at claim 7.

Moreover, the '011 Patent's specification discloses no embodiments other than those where a link from the portal includes PAD (e.g., portal ID or long portal ID) as "user identification."  *See* '011 Patent at 7:66–8:18 (describing an exemplary link from a portal that identifies a user with a portal ID within long portal ID), 7:35–42 ("The link the explanation page will pass information about the ***portal long User ID*** to the financial institution's sign up page."), 5:47–50 ("A link on the page at the portal web server is a URL referencing a page on the financial institution's site and ***includes the user's portal ID in the URL***.").  Thus, Plaintiff's contention that "user identification"

---

[23] *See Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985) ("The prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance."); *see also Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1326 (Fed. Cir. 2003) (explaining that prosecution disclaimer arises where the "disavowing actions or statements made during prosecution [are] both clear and unmistakable.").

should be interpreted broadly enough to encompass not only PAD, but also FAD and PFAD, is inconsistent with both the specification and prosecution history.

Finally, Plaintiff's contention that Defendants' proposed construction is improper in light of claim differentiation is unavailing. Claim 8 recites "wherein the user identification includes a user portal ID." *Id.* at Claim 8. The specification explains that Claim 8's recited "portal ID" is not equivalent to—and is in fact ***narrower*** than—the "portal authentication data" (*i.e.*, PAD) presented in Defendants' construction. Specifically, the specification states that PAD is not limited to a user's portal ID; rather, it may include (1) "password[s] that go[] with th[e] portal user ID[s]"; (2) "node address[es], such as an IP address, [that] limit[] access to only . . . from a particular IP address"; and (3) security keys and browser cookies. *See id.* at 2:5–8, 4:34–42, 11:1–11, FIG. 4 (cookies from user browser 202 to portal 204), FIG. 6 (logging into Yahoo). As such, Defendants' construction would not violate the claim differentiation doctrine.

Defendants agree with Plaintiff that the term "respective user identifications" in claim 9 refers to the respective "user identifications" for each of the "plurality of different users" recited in the claim. As explained with respect to the term "a user identification" from claim 7, however, Plaintiff's contention that the plain and ordinary meaning of "user identification" is broad enough to cover all three types of authentication data described in the patent should be rejected because it is inconsistent with the intrinsic record. Defendant's position is that term "user identification" (whether the claim recites a singular user identification or a plurality of user identifications) should have the same meaning.

Because the intrinsic record demonstrates that "user identification" includes PAD, but not FAD or PFAD, the terms "a user identification" and "respective user identifications" should be construed as "user-specific portal authentication data that authenticates the user to the portal."

### 3. *"associating the user identification with the portal"* (claim 7) / *"associating respective user identifications with the portal"* (claim 9)

| Plaintiff's Construction | Defendants' Construction[24] |
|---|---|
| "associating the user identification with the service that stands between the user and another service to perform an added value" / "associating respective user identifications with the service that stands between the user and another service to perform an added value" | "storing or recording the user-specific portal authentication data included in the link" |

The term "associating the user identification with the portal" and "associating respective user identifications with the portal" should be construed because, in the context of the '011 Patent, the term "associating" requires a degree of permanence to link a user's portal account and financial account to facilitate "servicing a request by the portal." *See* '011 Patent at claim 7; *see also id.* at 4:39–65, 3:19–31, 5:40–46, Abstract; *see also Free Stream Media Corp. v. Alphonso Inc.*, No. 2:15-cv-1725-RWS, 2017 WL 1165578, at *13 (E.D. Tex. Mar. 29, 2017), *aff'd*, 2021 WL 1880931 (Fed. Cir. May 11, 2021) (finding "that 'associated with' has more than one ordinary meaning in the context of the intrinsic evidence"). Plaintiff's proposed constructions not only disregard this important context from the specification, but also inject ambiguity by importing Plaintiff's proffered "portal" construction. *See* discussion *supra* Section III.F.1 (discussing unnecessary and unhelpful "portal" construction).

Plaintiff argues that Defendant's construction should not be adopted because the '011 Patent describes "associating" and "storing"/"recording" as separate steps. To the contrary, the specification describes "storing"/ "recording" as an aspect of the "associating" step. Specifically,

---

[24] Defendants agree with Plaintiff that the term "respective user identifications" in claim 9 refers to respective "user identifications" for each of the "plurality of different users" recited in the claim. As explained above with respect to the term "associating the user identification with portal" from claim 7, however, Defendant's position is that "associating" requires storing or recording the user-specific portal authentication data whether the claim recites a singular user identification or a plurality of user identifications.

the '011 Patent explains that when a user "requests that the[ir] accounts be linked," the financial institution "performs its conventional user authentication and *remembers* the user's portal ID, *storing it in a list of all other signed up users*." '011 Patent at 5:44–52.  The patent elaborates on the "storing" process by stating that, if the user succeeds in authenticating himself or herself with the financial institution server," the financial institution server "*record[s]* the user's portal ID *and associat[es]* it with the user." '011 Patent at 5:52–56.  The '011 Patent does not disclose any method for associating a user's portal ID with the user other than the process of linking user portal accounts with a financial account by "*saving* the unique [] portal ID *with* the customer profile at [the] financial institution." *See id.* at 7:35–42.  Just as a user's portal and financial accounts are associated/linked through storing or recording the user's portal ID (e.g., PAD), the '011 Patent explains that the user's accounts can be de-linked or unassociated by "cancel[ling] the portal's access to selected users' data," which "*remove[s]* the portal ID from the financial institution profile." *Id.* at 7:16–19.

The patent further describes that, after associating a user and portal by storing the user's PAD with the user's account, that information is thereafter used when a portal uses PAD to request data for a particular user.  Specifically, the patent explains that a "portal can request data for a particular user over the trusted link or can request bulk data for all users, *using portal authentication data*, as opposed to user authentication data." *Id.* at Abstract; *see also id.* at 3:20–32 (explaining that a portal "request[s] data for a particular user over the trusted link or can request bulk data for all users[] using portal authentication data"); *id.* at 11:55–59 (explaining that to retrieve OFX data, a portal initiates a request "as a client of the financial institution's OFX server, [by] providing a general [portal] Password (as opposed to a specific password for an individual user) and *requesting data for a specific [portal] ID*").  The system could not utilize a user's PAD

in this way if it were not stored/recorded as part of associating a user's portal account with their financial institution account.  Indeed,  the '011 Patent expressly discloses that such information is stored/recorded by the financial institution, explaining that the institution "has a list of its account holders that also have accounts with a portal and have agreed to link their portal account and user account with the financial institution."  *Id.* at Abstract; *see also id.* at FIG. 3 (element 116).

Additionally, Defendants' construction includes "user-specific portal authentication data included in the link" for consistency with the '011 Patent's specification and claim 7's plain language.  Specifically, "the user identification" recited in the "associating the user identification with the portal" claim element refers back to the claim's earlier recitation of "a user following a link from a portal, the link including *a user identification*."  *See* '011 Patent at Claim 7.  As such, "the user identification" being associated is the "user-specific portal authentication data included in the link."     *See* discussion *supra* Section III.F.2 (discussing construction for "user identification"); *see also Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1030–31 (Fed. Cir. 2002) ("A word or phrase *used consistently* throughout a claim should be *interpreted consistently*." (emphasis in original)); *C-Cation Techs., LLC v. Time Warner Cable, Inc.*, No. 2:14-cv-0059-JRG-RSP, 2015 WL 1849014, at \*2 (E.D. Tex. Apr. 20, 2015) ("[A] term's context in the asserted claim can be very instructive. . . . because claim terms are typically used consistently throughout the patent." (internal citations omitted)).

Because the '011 Patent does not disclose any techniques for "associating the user identification with the portal" that do not involve permanence through remembering, storing, recording, or saving, the terms "associating the user identification with the portal" and "associating respective user identifications with the portal" should be construed as "storing or recording the user-specific portal authentication data included in the link."

### G.    Plaintiff Has Waived Its Indefiniteness Positions

Plaintiff has waived any arguments in support of its indefiniteness position by failing to present them in its opening brief. *See Intell. Ventures II LLC v. Sprint Spectrum, L.P.*, 2019 WL 2959568, at *3 (E.D. Tex. Apr. 18, 2019) (Payne, J.), *R&R adopted*, 2019 WL 1987204 (E.D. Tex. May 6, 2019) (Gilstrap, C.J.) (quoting *Novosteel SA v. U.S. Bethlehem Steel Corp.*, 284 F.3d 1261, 1273 (Fed. Cir. 2002)). While Plaintiff purports to reserve a right to "respond to Defendants' indefiniteness arguments in reply," Br. at 21, 25, 29, 40, "[i]t is black-letter law that arguments raised for the first time in a reply brief are waived 'as a matter of litigation fairness and procedure.'" *Intell. Ventures*, 2019 WL 2959568, at *3. Plaintiff cannot reserve a right to delay its merits positions until the reply because that is a right it simply does not have under this Court's rules and precedents.

Plaintiff's Opening Brief does not cite the specification, claims, prosecution history, or any other intrinsic or extrinsic evidence in support of its definiteness positions—its ***entire*** single-paragraph discussion recites that patents are presumed valid, and that factual issues underlying indefiniteness must be proven by clear and convincing evidence. Br. at 50. However, Plaintiff neither discusses nor disputes the facts of this case, including the facts cited by Defendants in their Rule 4-3 Submissions. Nor does Plaintiff assert any factual or legal defense of the definiteness of the specific terms in dispute.

Under this Court's precedent, Plaintiff's failure to include merits positions in its opening brief constitutes a waiver of any opposition to Defendants' assertions of indefiniteness. *Intell. Ventures*, 2019 WL 2959568, at *3; Local Rule CV-7(d) (noticing parties of the consequences of failing to "oppose a motion in the manner prescribed herein," which requires stating "reasons in opposition" and "citation of authorities"). Courts, including the Federal Circuit, reach the same result where a patentee failed to offer timely briefing. *See Saso Golf v. Nike*, 843 Fed. App'x 291,

297 (Fed. Cir. 2021) (affirming district court judgment of indefiniteness when patentee "turned down the opportunity to offer briefing" on an issue that could have supported definiteness); *accord Constant Compliance v. Emerson*, 598 F. Supp. 2d 842, 847 (N.D. Ill. 2009) (finding waiver because litigant failed to raise arguments "at the proper time" set by the scheduling order and rejecting the argument that court should still consider untimely arguments because "[t]o hold otherwise would eviscerate the purpose of the [scheduling] order by disadvantaging [the timely party] and advantaging [the late party]").

Plaintiff's decision to withhold its merits positions until its reply is prejudicial to Defendants. First, Defendants have no opportunity to rebut the arguments presented for the first time in Plaintiff's arguments reply brief. In the normal course, waiver ensures "litigation fairness and procedure," by giving the parties the opportunity to develop arguments and crystalize them in a timely manner, avoiding significant changes at a belated stage of briefing. *Intell. Ventures*, 2019 WL 2959568, at *3. However, it is "particularly improper" to raise arguments "for the first time in a reply brief" when "there is 'no *right* to respond to the reply brief,'" as is the case with *Markman* briefing. *Id.* (emphasis original); Local Patent Rule 4-5(a)-(c) (providing for an "opening brief," a "responsive brief," and a "reply brief" but no surreply); Order Granting Motion to Consolidate Claim Construction Briefing[25] ("Briefing Consolidation Order") (setting pages for opening, response, and reply briefs).  And in this case, despite seeking—and securing—an order from the court allowing "75 pages to address all disputed terms" for Plaintiff's opening brief, Briefing Consolidation Order at 2, Plaintiff ends its brief at 50 pages, with a full 25 pages of unused space to spare. *See* Br. at 50. Accordingly, Plaintiff did not lack the space to brief its positions on

---

[25] Dkt. 35 in Case No. 4:21-cv-00090; Dkt. 42 in 4:21-cv-00091; Dkt. 32 in Case No. 4:21-cv-00122; and Dkt. 28 in Case No. 4:21-cv-00174.

the merits of indefiniteness; rather Plaintiff "could have also added the [indefiniteness] argument[s] to their initial brief, and made the tactical choice not to do so." *Intell. Ventures*, 2019 WL 2959568, at *3. The Court should not reward Plaintiff's apparent "tactical choice" to withhold its positions, depriving Defendants of an opportunity to develop a response on the merits (and forcing Defendants to spend time and resources briefing this waiver-related argument).

Second, the ordinary course of claim construction briefing before this Court demonstrates the impropriety of Plaintiff's failure to brief its position. According to Docket Navigator, this Court has issued seventeen *Markman* opinions addressing indefiniteness from January 1, 2015 to present. In all seventeen cases—and as recently as November 2, 2021—the plaintiff substantively briefed indefiniteness in its opening brief, including with citations to the specification, claims, and (as appropriate) prosecution history and extrinsic evidence. [26] *See, e.g.*, *Blue Spike v. Grande Commc'ns*, 4:20-CV-671-ALM (E.D. Tex. Nov. 2, 2021) (Plaintiff's Opening Brief, Dkt. No. 37, at 12-13,17-19, 24-31, 34-35, 40-42, 44-45, 47-50, 54-60) (citing specification, claims, and prosecution history supporting definiteness); *Enserion, LLC v. Orthofix, Inc.*, 4:20-CV-108-ALM (E.D. Tex. Mar. 4, 2021) (Plaintiff's Opening Br., Dkt. No. 47, at 5-6, 8-9, 11-13) (same); *Wapp Tech. v. Seattle Spinco et al.*, 4:18-cv-469-ALM (E.D. Tex. Apr. 27, 2020) (Plaintiff's Opening

---

[26] Nor should the Court excuse Plaintiff's failure to brief its position in the opening on the ground that Defendants bear the substantive burden of persuasion on invalidity. Any such suggestion conflates Defendants' substantive "burden of persuasion" ("specifying which party loses if the evidence is balanced") with Plaintiff's initial "burden of production" ("specifying which party must come forward with evidence at various stages in the litigation"). *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 100 n.4 (2011). As demonstrated above, the uniform practice in this District recognizes that patentees bear the initial burden of production, specifying their "evidence" at the opening brief stage "in the litigation." *See id.* That uniform practice is also consistent with general case management principles (i.e., first-raised-in-reply is waived) and the structure of EDTX *Markman* briefing specifically (i.e., no sur-replies). It is also consistent with substantive patent law on indefiniteness, given Supreme Court guidance that "th[e] presumption of validity does not alter the degree of clarity that § 112, ¶ 2 demands from patent applicants." *Nautilus*, 572 U.S. at 912 n.10.

Brief, Dkt. No. 154, at 18-20) (same); *Dareltech v. Samsung Elecs.*, 4:18-cv-702-ALM (E.D. Tex. Mar. 16, 2020) (Plaintiff's Opening Brief, Dkt. No. 38, at 21-23, 25-28) (same); *Aptustech LLC v. Trimfoot Co.*, 4:19-CV-133-ALM, 2020 WL 772456 (E.D. Tex. Feb. 18, 2020) (Plaintiff's Opening Brief, Dkt. No. 39 at 16-20) (same). Plaintiff's failure to brief the merits is an extraordinary departure from briefing norms, and the Court should accordingly treat Defendants' indefiniteness positions as unopposed.

Third, as this is Defendants' last opportunity to address indefiniteness, Defendants also note that the Court should not allow Plaintiff to present its affirmative positions on definiteness in reply by characterizing them as "rebuttal" positions. *Intell. Ventures*, 2019 WL 2959568, at *3. Plaintiff's "own arguments show that they could have raised the…argument in their initial brief." *Id.* Plaintiff was "on notice that" indefiniteness "was at issue because they address it in their opening brief," assigning it an entire section header. *Id.* Yet, Plaintiff omitted the merits from its brief. A delay-through-rebuttal approach would greenlight an end-run around this Court's scheduling order and case management principles. *Constant Compliance*, 598 F. Supp. 2d at 847. Accordingly, the Court should deem Defendants' arguments unopposed and deem the following indefinite: "data set," "at least one output data group is a plurality of output data groups," "intents," "determining, at least the one…," "linguistic analysis," "fully representative," and "better representative."

## IV.    CONCLUSION

For the reasons set forth above, Defendants respectfully requests that the Court adopt their proposed constructions for the disputed claim terms of the Asserted Patents.  Defendants further respectfully request that the identified claims be found indefinite.

Dated:  November 24, 2021

Respectfully submitted,

By: */s/ Kathryn R. Grasso*
Eric H. Findlay
State Bar No. 00789886
Debby Gunter
State Bar No. 24012752
FINDLAY CRAFT, P.C.
102 N. College Ave. Suite 900
Tyler, Texas  75702
Tel:  (903) 534-1100
Fax:  (903) 534-1137
Email: efindlay@findlaycraft.com
Email: dgunter@findlaycraft.com

Kathryn Riley Grasso
Damon Marcus Lewis
DLA Piper LLP (US)
500 Eighth Street NW
Washington, DC 20004
Tel: (202) 799-4000
Fax: (202) 799-5000
Email: Kathryn.Riley@us.dlapiper.com
Email: Damon.Lewis@us.dlapiper.com

Christian Chessman
DLA Piper LLP (US)
2000 University Avenue
East Palo Alto, CA 94303-2215
Tel: (650) 833-2112
Fax: (650) 687-1141
Christian.Chessman@us.dlapiper.com

**COUNSEL FOR DEFENDANT**
**WALMART INC.**

*/s/ Keith B. Davis*
Michael A. Oblon
Lead Attorney
Admitted pro hac vice
Email: moblon@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (216) 579-0212

Keith B. Davis
Texas State Bar No. 24037895
Email: kbdavis@jonesday.com
JONES DAY
2727 North Harwood Street
Dallas, TX 75201
Telephone: (214) 220-3939
Facsimile: (214) 959-5100

**ATTORNEYS FOR DEFENDANT
DEEZER S.A.**

*/s/ Talbot R. Hansum*
Brett C. Govett
State Bar No. 08235900
Lead Attorney
Hao J. Wu
State Bar No. 24106601
Norton Rose Fulbright US LLP
2200 Ross Avenue, Suite 3600
Dallas, TX 75201
Tel: 214.855.8118
Fax: 214.855.8200
brett.govett@nortonrosefulbright.com
hao.wu@nortonrosefulbright.com

Stephanie N. DeBrow
State Bar No. 24074119
Catherine J. Garza
State Bar No. 24073318
Talbot R. Hansum
State Bar No. 24084586
Norton Rose Fulbright US LLP
98 San Jacinto Boulevard
Suite 1100
Austin, TX 78701-4255
Tel: 512.474.5201
stephanie.debrow@nortonrosefulbright.com
cat.garza@nortonrosefulbright.com
talbot.hansum@nortonrosefulbright.com

**COUNSEL FOR DEFENDANT
THE CHARLES SCHWAB**

**CORPORATION**

*/s/ Ryan Yagura*
Ryan K. Yagura
Tex. Bar No. 24075933)
O'Melveny & Myers LLP
400 S. Hope Street
Los Angeles, CA 90071
Telephone: 213-430-6000
Facsimile: 213-430-6407
ryagura@omm.com

Laura Bayne Gore
*Pro Hac Vice*
O'Melveny & Myers LLP
Times Square Tower, 7 Times Square
New York, NY 10036
Telephone: 212-326-2000
Facsimile: 212-326-2061
lbayne@omm.com

**COUNSEL FOR DEFENDANT
JPMORGAN CHASE & CO.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on November 24, 2021.

/s/ *Keith B. Davis*