**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| R2 Solutions LLC, <br><br>          Plaintiff, <br><br> v. <br><br> Deezer S.A., <br><br>          Defendant. | Civil Action No. 4:21-cv-00090 <br><br><br> Jury Trial Demanded |

## SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff R2 Solutions LLC files this Second Amended Complaint against Deezer S.A. for infringement of U.S. Patent Nos. 8,190,610 ("the '610 patent"), 8,341,157 ("the '157 patent"), 7,698,329 ("the '329 patent"), 8,209,317 ("the '317 patent"), and 9,928,279 ("the '279 patent"). The '610 patent, '157 patent, '329 patent, '317 patent, and '279 patent are referred to collectively as the "patents-in-suit."

## THE PARTIES

1. Plaintiff R2 Solutions LLC ("R2 Solutions") is a Texas limited liability company located in Frisco, Texas.

2. Defendant Deezer S.A. ("Deezer") is a company organized under the laws of France, with its principal place of business at 24 rue de Calais 75009 Paris, France. On information and belief, Defendant Deezer, S.A. offers its products and/or services, including those accused herein of infringement, to customers and potential customers located in Texas and in this District. Deezer also directs advertisements to residents of the state of Texas. For example, Deezer sponsored a "Together We Make Magic" concert event in Houston, Texas. *See*

https://www.prnewswire.com/news-releases/deezer-surprises-houston-high-school-with-live-performance-by-top-charting-latin-band-cnco-300962400.html.

## JURISDICTION AND VENUE

3.      This action arises under the patent laws of the United States, 35 U.S.C. § 101, *et seq*.  This Court's jurisdiction over this action is proper under the above statutes, including 35 U.S.C. § 271, *et seq*., 28 U.S.C. § 1331 (federal question jurisdiction), and 28 U.S.C. § 1338 (jurisdiction over patent actions).

4.      This Court has personal jurisdiction over Deezer in accordance with due process and/or the Texas Long Arm Statute because, among other things, Deezer does business in this State.  For example, Deezer has engaged, and continues to engage, in continuous, systematic, and substantial activities within this State, including the substantial marketing and sale of products and services within this State and this District.  Indeed, this Court has personal jurisdiction over Deezer because it has committed acts giving rise to R2 Solutions' claims for patent infringement within and directed to this District and has derived substantial revenue from its goods and services provided to individuals in this State and this District.

5.      Relative to patent infringement, Deezer has committed and continues to commit acts in violation of 35 U.S.C. § 271, and has made, used, marketed, distributed, offered for sale, and/or sold infringing products and services in this State, including in this District, and otherwise engaged in infringing conduct within and directed at, or from, this District.  Such infringing products and services include: (1) the Deezer music application and (2) the Deezer data analytics system built on Apache Hadoop.  All such infringing systems are hereinafter referred to collectively as "Deezer systems."  Such Deezer Systems have been and continue to be offered for sale, distributed to, sold, and used in this District, and the infringing conduct has caused, and

continues to cause, injury to R2 Solutions, including injury suffered within this District.  These are purposeful acts and transactions in this State and this District such that Deezer reasonably should know and expect that it could be haled into this Court because of such activities.

6.      Venue is proper in this District under 28 U.S.C. §§ 1391(b), (c), (d) and/or 1400(b) because Deezer is a foreign corporation organized under the laws of France.

## BACKGROUND

7.      The patents-in-suit were filed by Yahoo! Inc. ("Yahoo!") between 2006 and 2009. At the time, Yahoo! was a leading Internet communications, commerce, and media company. Yahoo! invested billions of dollars in research and development over this period, filing hundreds of patent applications each year to cover the innovative computing technologies emerging from its expansive research and development efforts.

8.      Yahoo! began as a directory of websites that two Stanford graduate students developed as a hobby.  The name "Yahoo" stands for "Yet Another Hierarchical Officious Oracle," a nod to how the original Yahoo! database was arranged hierarchically in layers of subcategories. From this initial database, Yahoo! would develop and promulgate numerous advancements in the field of data storage and recall.

9.      For example, in 1995, Yahoo! introduced Yahoo! Search.  This software allowed users to search the Yahoo! directory, making it the first popular online directory search engine. This positioned Yahoo! as the launching point for most users of the World Wide Web.  By 1998, Yahoo! had the largest audience of any website or online service.

10.      However, the early iterations of Yahoo! Search did not operate like a modern search engine because Yahoo! Search was only a directory.  Yahoo! Search first integrated a Web crawling engine in 2000.  Yahoo! Search used Google's Web crawling engine from 2000–2004.

During this time, Yahoo! was developing its own Web search technologies.  Yahoo! deployed its own Web crawler in early 2004.  The engine, known as Slurp, allowed Yahoo! to collect documents from the Web and build a searchable index.  The patents-in-suit relate to innovations associated with Yahoo! Search that were developed and implemented during this period, which enabled Yahoo! to become Google's biggest competitor in the search engine space.

**THE PATENTS-IN-SUIT**

11.      The '610 patent is entitled, "MapReduce for Distributed Database Processing."  The '610 patent lawfully issued on May 29, 2012 and stems from U.S. Patent Application No. 11/539,090, which was filed on October 5, 2006.  A copy of the '610 patent is available at:

https://patentimages.storage.googleapis.com/d0/f6/e1/2600fa22db7db0/US8190610.pdf.

12.      The '157 patent is entitled, "System and Method for Intent-Driven Search Result Presentation."  The '157 patent lawfully issued on December 25, 2012 and stems from U.S. Patent Application No. 12/533,299, which was filed on July 31, 2009.  A copy of the '157 patent is available at:

https://patentimages.storage.googleapis.com/18/06/8f/481f29c50e5fd9/US8341157.pdf.

13.      The '329 patent is entitled, "Method for Improving Quality of Search Results by Avoiding Indexing Sections of Pages."  The '329 patent lawfully issued on April 13, 2010 and stems from U.S. Patent Application No. 11/652,356, which was filed on January 10, 2007.  A copy of the '329 patent is available at:

https://patentimages.storage.googleapis.com/0a/40/cb/6be96af39efb21/US7698329.pdf.

14.      The '317 patent is entitled, "Method and Apparatus for Reconstructing a Search Query."  The '317 patent lawfully issued on June 26, 2012 and stems from U.S. Patent Application No. 13/270,933, which was filed on October 11, 2011.  The '317 patent is a continuation of U.S.

4

Patent Application No. 12/765,676, filed on April 22, 2010, which is a continuation of U.S. Patent Application No. 11/502,202, which was filed on August 10, 2006.  A copy of the '317 patent is available at:

https://patentimages.storage.googleapis.com/98/e5/c8/ff243052e7bdb4/US8209317.pdf.

15.     The '279 patent is entitled, "Media Device and User Interface for Selecting Media." The '279 patent lawfully issued on March 27, 2018 and stems from U.S. Patent Application No. 14/145,079, which was filed on December 31, 2013.  The '279 patent is a continuation of U.S. Patent Application No. 11/250,358, which was filed on October 14, 2005.  A copy of the '279 patent is available at:

https://patentimages.storage.googleapis.com/a9/93/9d/042c4cf345b47c/US9928279.pdf.

16.     R2 Solutions is the owner of the patents-in-suit with all substantial rights, including the exclusive right to enforce, sue, and recover damages for past and future infringements.

17.     The claims of the patents-in-suit are directed to patent eligible subject matter under 35 U.S.C. § 101.  They are not directed to abstract ideas, and the technologies covered by the claims consist of ordered combinations of features and functions that, at the time of invention, were not, alone or in combination, well-understood, routine, or conventional.

18.     Indeed, the specifications of the patents-in-suit disclose shortcomings in the prior art and then explain, in detail, the technical way the claimed inventions resolve or overcome those shortcomings.   For example,  the '610 patent  explains that "conventional  MapReduce implementations do not have facility to efficiently process data from heterogeneous sources" and that "it is impractical to perform joins over two relational tables that have different schemas."  '610 patent at 3:9–20.  To solve these problems, the '610 patent discloses an invention where user-configurable MapReduce functions are applied to data from heterogeneous data sources (having

5

different schema), followed by application of a reduce function on intermediate data based on a common key.  As the specification explains:

> [T]he MapReduce concept may be utilized to carry out map processing independently on two or more related datasets (e.g., related by being characterized by a common key) even when the related data sets are heterogeneous with respect to each other, such as data tables organized according to different schema. The intermediate results of the map processing (key/value pairs) for a particular key can be processed together in a single reduce function by applying a different iterator to intermediate values for each group. In this way, operations on the two or more related datasets may be carried out more efficiently or in a way not even possible with the conventional MapReduce architecture.

*Id.* at 8:47–58.

19.     Such a solution is embodied, for example, in Claim 1 of the '610 patent:

A method of processing data of a data set over a distributed system, wherein the data set comprises a plurality of data groups, the method comprising:

partitioning the data of each one of the data groups into a plurality of data partitions that each have a plurality of key-value pairs and providing each data partition to a selected one of a plurality of mapping functions that are each ***user-configurable*** to independently output a plurality of lists of values for each of a set of keys found in such map function's corresponding data partition to form corresponding intermediate data for that data group and identifiable to that data group, ***wherein the data of a first data group has a different schema than the data of a second data group*** and the data of the first data group is mapped differently than the data of the second data group so that different lists of values are output for the corresponding different intermediate data, ***wherein the different schema and corresponding different intermediate data have a key in common***; and

reducing the intermediate data for the data groups to at least one output data group, including processing the intermediate data for each data group in a manner that is defined to correspond to that data group, so as to result in a ***merging of the corresponding different intermediate data based on the key in common***,

6

wherein the mapping and reducing operations are performed by a distributed system. (emphases added).

20.     The inventions described and claimed in the '610 patent improve the speed, efficiency, effectiveness, and functionality of computer systems.  Moreover, the inventions provide an improvement in computer functionality rather than economic or other tasks for which a computer is used in its ordinary capacity.  For example, the '610 patent states that the disclosed inventions "enhance[] the utility of the MapReduce programming methodology." *Id.* at Abstract, 1:31–33, 1:66–2:2.

21.     The '610 patent specification goes on to explain that "[t]he intermediate results of the map processing (key/value pairs) for a particular key can be processed together in a single reduce function by applying a different iterator to intermediate values for each group." *Id.* at Abstract, 1:37–39, 2:4–8.  And the specification discusses the use of multiple processors to perform processing functions in parallel. *See id.*  As a result, computer functionality is improved. *Id.* at 1:42–44.

22.     Additionally, the claimed inventions provide for more dynamic, customizable, and efficient processing of large sets of data. *See, e.g., id.* at 2:58–61, 4:18–22.  The inventions provide optimization, which increases efficiency and reduces processor execution time. *See id.* at 2:64–67 (explaining that the claimed invention "can make the processing of the output data more efficient and/or convenient").  As the specification describes, the combiner function in the claimed invention "helps reduce the network traffic and speed up the total execution time." *Id.* at 3:1–8.

23.     The specification also discusses the use of configurable settings to reduce processing overhead. *See, e.g., id.* at 4:60–62, 5:33–39.

24.     Relative to the '157 patent, the specification explains that if, as in the case of traditional search engines, the "engine simply regards a web query as, for example, a 'bag of

words', the search engine will search for web pages and other data objects (e.g., images, audio files, text files) that contain, or are otherwise associated with, the individual words within the query." '157 patent at 4:1–5.  However, simply treating a user query as a "bag of words" may yield results that do not align with the purpose of the user's search.  Thus, the specification teaches:

> When a user submits a query to a web search service such as the Yahoo! or Google search services, the user generally has some intent. The user's intent may simply be to explore information available on the web relating to one or more topics, for example, a user may simply wish to browse web sites relating to "rainforests" without having any specific purpose in mind. Commonly, however, a user has a more focused purpose in mind. By entering a "rainforest" query, a user may wish to obtain information on traveling to a rainforest, or on purchasing CDs or books having rainforests as a subject or purchasing rainforest themed merchandise such as clothing or accessories.

*Id.* at 3:46–57.

25.    While other search engines existing at the time could tailor search results by ranking the results and displaying each result with a title and brief abstract taken from the document, the '157 patent explains how "results could be significantly enhanced if the likely intent of the query is known." *Id.* at 4:16–17.  Rather than return all documents having matching keyword—i.e., by using traditional indexing methods—a narrower set of results can be returned if the search results are "ranked such that results that are more relevant to the user's intent appear at or near the top of the search results." *Id.* at 4:17–19.  Interpretation of the result set is further improved because the results display may be customized based on the user's search intent.  *See id.* at 19–26.

26.    Indeed, the claims of the '157 patent provide just such a solution to the problem of identifying relevant search results using traditional document indexing methods.  For example, Claim 1 of the '157 patent discloses a method comprising:

8

receiving, over a network, a query from a user, the query comprising at least one query token;

analyzing the query, using at least one computing device, to identify at least one query keyword;

determining, at least the one computing device, *a plurality of intents from the at least one keyword*, each of the plurality of intents indicates a type of information regarding the query keyword that is likely to be desired by a user submitting the query;

classifying the query, using the at least one computing device, *into at least one of the plurality of intents*;

identifying, using the at least one computing device, a plurality of data objects available over the network that match the at least one query keyword;

assigning, using the at least one computing device, *at least one of the plurality of intents* to at least some of the plurality of data objects;

ranking, using the at least one computing device, the plurality of data objects;

building a result, using the at least one computing device, using the ranked plurality of data objects, the result comprises a plurality of display entries, *at least one display entry customized to a respective assigned intent is constructed for each of the ranked plurality of data objects*; and

transmitting the result, over the network, to the user.

(emphases added).

27.    The inventions described and claimed in the '157 patent improve the speed, efficiency, effectiveness, and functionality of computer systems. Moreover, the inventions provide an improvement in computer functionality rather than economic or other tasks for which a computer is used in its ordinary capacity. For example, by ranking documents based on intent, rather than using "a traditional {query,document} score," the probability is greater that a relevant result will be in the final result set presented to the user. *See id.* at 12:7–22. This reduces the

number of queries that must be processed in order to return relevant results to the user.  As a result, the processor is free to allocate more resources to other tasks.

28.     The '329 patent explains that nefarious parties can trick traditional search engines "into recalling documents and inflating their ranking" using techniques known as "search engine spamming."  '329 patent at 2:6–8.  For example, spamming may be used to "trick search engine ranking algorithms into recalling and highly ranking documents that contain . . . sponsored links to a web merchant."  *Id.* at 2:8–11.  The result is that search results for many queries include irrelevant content that the querier did not desire.  *Id.* at 2:14–17.  The specification offers an illustration involving a user shopping for a camera:

> A typical example of search engine spam is when a user tries to search for the terms "digital camera reviews" and expects to find pages which review various models of digital cameras, detailing performance specifications, sample images and reviewer pros and cons list. Having this expectation when the user clicks on a link for one of the results, the user is instead led to a page that contains nothing but a plethora of keywords and links to other stores where he can buy the camera.

*Id.* at 2:18–27.  Thus, "there is need for mechanisms that prevent hiding of search engine spam but yet allow webmasters to designate page content that should not be indexed."  *Id.* at  2:34–37.

29.     The specification describes a novel approach to achieve this goal.

> As a crawler examines an individual document, one of the attributes that can be considered is section structure. In examining the various sections, the crawler identifies sections to ignore, that is, to not index in search engine indexes and or otherwise use for recalling the document. Such sections are referred to herein as "no-recall sections." Those portions that are indexed for recalling are referred to as recall sections. In an embodiment, a crawler ignores no-recall sections demarcated by, for example, a tag. In another embodiment a no-recall section may be identified by analyzing section content rather than examining only delimiters. The terms inside no-recall sections do not contribute to the document term frequency counts

and are not used for recalling the documents in response to search engine queries. However the no-recall sections are included as input to forms of analysis of the document that affect, for example, the document's ranking. Links inside the no-recall sections as well as the rest of the document may be followed in order to discover new content. The document may be analyzed for the amount of advertisements or other features in its entirety. Therefore, terms inside the no-recall sections can affect document ranking.

*Id.* at 3:7–27. This prevents nefarious parties from hiding search engine spam because pages with "copious amounts of advertisements, or low quality links, will be readily identified and ranked accordingly." *Id.* at 3:28–31.

30. Claim 1 of the '329 patent embodies this solution:

A method, comprising:

ranking a plurality of documents recalled by a search engine for a query;

wherein the plurality of documents contain certain documents, *each document of said certain documents containing at least one section that is not used by said search engine for recall* and one or more sections that are used by said search engine for recall;

*wherein ranking* a plurality of documents includes ranking said plurality of documents *based, at least in part, on the at least one section of said certain documents not used by said search engine to recall documents*; and;

wherein the method is performed by one or more computing devices.

(emphases added).

31. The claimed method of indexing pages improves navigation of the World Wide Web by increasing the relevance of search results and thwarting nefarious Web users seeking to game Web query rankings. *See, e.g.*, *id.* at 1:67–2:17. By improving the functionality of the Web, the claimed invention is necessarily rooted in the improvement of computer functionality rather than economic or other tasks for which a computer is used in its ordinary capacity. For example, by not ignoring no-recall sections when ranking the documents, the claimed invention prevents a

document from being "designed so that content that increases recall and/or ranking potential is placed in the recall section and content that diminishes high ranking potential is hidden in a no-recall section." *Id.* at 4:1–9.  This allows "[a]ll the attributes in all of the sections of a document such as 'links', frequency of terms, coloring, font, etc." to be considered in the spam and relevancy analyses. *Id.* at 4:13–16.  The result is that a search engine can "affect the recall and ranking of documents to more accurately reflect relevance of the documents to search engine queries." *Id.* at 3:1–3.

32.     Relative to the '317 patent, the specification explains that existing search engine interfaces "may be rigid and require uses to submit full queries to perform searche[s]." '317 patent at Abstract.  Traditional search engines were built with desktop computer users in mind.  Thus, they were designed with the assumption that a user had access to a full keyboard for composing a complete, properly structured search query.  However, as noted in the specification of the '317 patent, users at the time could increasingly access the internet from a variety of devices, including "cell phones, personal digital assistants, and the like." *Id.* at 1:44–47.  Portability started to become "an increasingly important concern for users." *Id.* at 1:50–52.  The increasing portability of these devices came with a tradeoff in input capabilities. *See id.* at 1:50–52.  For example, most phones at the time the '317 patent was filed did not have a full keyboard.  The simpler input mechanisms available on mobile devices presented a barrier to entering properly structured queries, thus limiting users' ability to fully explore the Internet. *See id.* at 1:52–53.

33.     To solve these problems, the '317 patent discloses "a flexible and intuitive system for reconstructing a search query based on a received partial query." *Id.* at 1:16–18.  This solution is embodied in Claim 1 of the '317 patent:

A computer database system for providing search results to a user in response to user submissions over a data network, the computer database system comprising:

a database configured to store information about events in the computer database system; and

a query reconstruction server in data communication with the database and operative to receive

a partial query submitted at a remote user client system by a user seeking search results matching the submitted partial query and, ***in response to the received partial query, determine a full query*** based on

(i)    the received partial query, and

(ii)    information stored in the database about queries previously-submitted by users,

wherein the submitted partial query comprises an abbreviated or incomplete search query which is not fully representative of an entire search query desired by the user and the full query is better representative of the entire search query desired by the user.

(emphasis added).

34.    The specification explains that partial queries are "shorthand ways of expressing typical search queries." *Id.* at 3:15–17.  For example, "auto ins" may be a partial query for the full search query "auto insurance."  *Id.* at 3:20–23.  While "auto ins" may be an intentional abbreviation, it might also be a typographical error resulting from the restrictive input options of a mobile device.  Because the claimed invention will nevertheless be able to take the incomplete query "auto ins" and return search results for "auto insurance," a broader array of mobile devices and input mechanisms may be used to search the Internet. *See id.* at 1:43–56.

35.    With respect to the '279 patent, the specification explains that the advent of portable media devices, many of which can fit in a pocket or purse, presented several problems for implementing media streaming services.  *See* '279 patent at 1:40–49.  For example, "portable media devices often have limited resources for user interfaces." *Id.* at 1:48–49.  User interfaces needed to be simple because keyboards and pointing devices were rare or unpractical and the displays on devices were small. *Id.* at 1:49–55.  Additionally, mobile devices must be designed to operate in challenging environments, such as during a user's workout session. *Id.* at 1:56–61.  The result is that manipulating playlists and choosing specific tracks or artists from the thousands of

choices offered by a music streaming service becomes burdensome. *Id.* at 1:62–65. At least in the context of someone driving an automobile or navigating traffic while jogging, interacting with a music stream using conventional inputs may even present a danger to the user's safety. *Id.* at 1:65–2:2.

36.    Advances in personal computer-based media players also presented several problems for conventional user interfaces. *See id.* at 2:3–18. Computer-based media players are designed to drive entertainment systems throughout a building, meaning that the user is often not in the same room as the computer controlling the system. *Id.* at 2:3–9. Such computers can be remotely controlled using a simplified interface displayed on a large format display like a television. *Id.* at 2:10–12. These systems were referred to as "10 foot UIs'" in reference to the typical distance between the user and the display. *Id.* at 2:13–15. "As with portables, the power to manipulate playlists and interact with the music based on mood or situation is reduced and the user is likely to be passive." *Id.* at 15–18. Interaction with the streaming service is hindered to a greater extent if the user opts to control the media player directly on the personal computer. *See id.* at 2:19–26. For example, this might force a user listening to music in one room to have to walk to another room, switch on a display, and access user devices (such as a mouse and keyboard) to simply adjust a playlist streaming from the user's personal computer. *Id.*

37.    The '279 patent addresses the issues described above with a novel user interface and method of ordering media files according to user preferences indicated using the novel interface. The user interface proposed in the '279 patent addresses the constraints that mobile devices and computer-based media players present by allowing implementation on "a device with a single user input or icon element." *Id.* at 26: 54–56. Indeed, this is the embodiment described in Claim 1 of the '279 patent:

14

A method, comprising:

establishing a streaming media connection between a media server computing device and a streaming appliance computing device for streaming a first media object to the streaming appliance computing device for consumption by a user; and

***obtaining a single-action user input*** at the media server computing device from the streaming appliance computing device while the first media object is streaming, ***the single action user input to indicate a desired relationship measure*** comprising a selected level of similarity between one or more attributes of the first media object and one or more attributes of individual media objects of a plurality of media objects, ***the single-action user input further indicating to select a second media object of the plurality of media objects for subsequent play***;

identifying the second media object for subsequent play in accordance with the desired relationship measure while the first media object is streaming at least in part in response to obtaining the single action user input, ***the first and second media objects having a relationship measure that satisfies the desired relationship measure***; and

initiating streaming of the second media object from the media server to the streaming appliance computing device.

(emphases added).

38.     The inventions described in the '297 patent provide an improved user interface that allows users to interact with a media streaming service on a broader array of devices without being forced into a passive experience where they can only listen to pre-programmed or random playlists. *See id.* at 2:1–2.  For example, the single-action user input described in Claim 1 allows users to indicate to the streaming provider how the user perceives tracks, albums, and artists relate.  The user may use the single-action input to indicate a level of similarity between media files (i.e., a track, album, etc.).  *Id.* at 13:63–14:28.  A playback function may then be invoked that "allows the user to select a media file based on a desired relationship measure."  *Id.* at 14:46–51.  The result is a personalized streaming experience that users can modify while on a mobile device or operating

15

a computer remotely, all without the need for advanced input devices such as pointers or keyboards.

39.     In essence, each of the patents-in-suit relate to novel and non-obvious inventions in the fields of search engines and database structures.

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. 8,190,610

40.     R2 Solutions incorporates paragraphs 1–11, 16–23, and 39 herein by reference.

41.     This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq*.

42.     R2 Solutions is the owner of the '610 patent with all substantial rights to the '610 patent, including the exclusive right to enforce, sue, and recover damages for past and future infringements.

43.     The '610 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

***Direct Infringement (35 U.S.C. § 271(a))***

44.     Deezer has directly infringed and continues to directly infringe one or more claims of the '610 patent in this District and elsewhere in Texas and the United States.

45.     To this end, Deezer has infringed and continues to infringe, either by itself or via an agent, at least claims 1–5, 17–21, 33–34, and 40–41 of the '610 patent by, among other things, making, offering to sell, selling, testing and/or using the Deezer data analytics system built on Apache Hadoop.

46.     Attached hereto as Ex. 1, and incorporated herein by reference, is a representative claim chart detailing how Deezer infringes the '610 patent.

47.     Deezer is liable for its infringements of the '610 patent pursuant to 35 U.S.C. § 271.

16

*Damages*

48.     R2 Solutions has been damaged as a result of Deezer's infringing conduct described in this Count.  Deezer is, thus, liable to R2 Solutions in an amount that adequately compensates it for Deezer's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**COUNT II**
**INFRINGEMENT OF U.S. PATENT NO. 8,341,157**

49.     R2 Solutions incorporates paragraphs 1–10, 12, 16–17, 24–27, and 39 herein by reference.

50.     This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq*.

51.     R2 Solutions is the owner of the '157 patent with all substantial rights to the '157 patent, including the exclusive right to enforce, sue, and recover damages for past and future infringements.

52.     The '157 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

*Direct Infringement (35 U.S.C. § 271(a))*

53.     Deezer has directly infringed and continues to directly infringe one or more claims of the '157 patent in this District and elsewhere in Texas and the United States.

54.     To this end, Deezer has infringed and continues to infringe, either by itself or via an agent, at least claims 1–5 and 7–10 of the '157 patent by, among other things, making, offering to sell, selling, testing and/or using the Deezer Music application.

55.     Attached hereto as Ex. 2, and incorporated herein by reference, is a representative claim chart detailing how Deezer infringes the '157 patent.

56.    Deezer is liable for its infringements of the '157 patent pursuant to 35 U.S.C. § 271.

*Indirect Infringement (Inducement – 35 U.S.C. § 271(b))*

57.    In addition and/or in the alternative to its direct infringement, Deezer has indirectly infringed and continues to indirectly infringe one or more claims of the '157 patent by inducing direct infringement by its customers and end users located in the United States.

58.    Deezer has knowledge of the '157 patent, its infringements, and the infringements of its customers and end users based, at least, on service of R2 Solutions' Original Complaint in this action.

59.    When a user of the Deezer Music application uses the search functionality, that user directly infringes the '157 patent, including at least claim 2, by controlling and obtaining beneficial use of the system, including servers and program instructions, provided by Deezer that performs the functionality described in Exhibit 2.

60.    Despite having knowledge (or being willfully blind to the fact) that use of the Deezer Music application infringes the '157 patent, Deezer has specifically intended, and continues to specifically intend, for persons (such as Deezer's United States customers) to access, purchase, exercise control over, benefit from, use, and/or otherwise interact with the Deezer Music application and its search functionality in ways that result in infringement of the '157 patent, including at least claim 2. Indeed, Deezer knew or should have known that its actions have induced, and continue to induce, such infringements.

61.    Deezer instructs and encourages customers and end users to use the Deezer Music application in a manner than infringes the '157 patent. For example, the Deezer Music application prominently displays a search bar and/or icon to induce users to search for content:



Deezer Desktop App.

62.    Deezer further provides users of the Deezer Music application with instructions and operation tips (*see, e.g.*, https://support.deezer.com/hc/en-gb/articles/214151665-Search) that include instructions on how to use the search functionality in a way that results in infringement of the '157 patent.

***Damages***

63.    R2 Solutions has been damaged as a result of Deezer's infringing conduct described in this Count.  Deezer is, thus, liable to R2 Solutions in an amount that adequately compensates it for Deezer's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT III
## <u>INFRINGEMENT OF U.S. PATENT NO. 7,698,329</u>

64.    R2 Solutions incorporates paragraphs 1–10, 13, 16–17, 28–31, and 39 herein by reference.

65.    This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq*.

66.    R2 Solutions is the owner of the '329 patent with all substantial rights to the '329 patent, including the exclusive right to enforce, sue, and recover damages for past and future infringements.

67.    The '329 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

*Direct Infringement (35 U.S.C. § 271(a))*

68.    Deezer has directly infringed and continues to directly infringe one or more claims of the '329 patent in this District and elsewhere in Texas and the United States.

69.    To this end, Deezer has infringed and continues to infringe, either by itself or via an agent, at least claims 1, 4–5, 8, and 11–12 of the '329 patent by, among other things, making, offering to sell, selling, testing and/or using the Deezer Music application.

70.    Attached hereto as Ex. 3, and incorporated herein by reference, is a representative claim chart detailing how Deezer infringes the '329 patent.

71.    Deezer is liable for its infringements of the '329 patent pursuant to 35 U.S.C. § 271.

*Indirect Infringement (Inducement – 35 U.S.C. § 271(b))*

72.    In addition and/or in the alternative to its direct infringement, Deezer has indirectly infringed and continues to indirectly infringe one or more claims of the '329 patent by inducing direct infringement by its customers and end users.

73.     Deezer has knowledge of the '329 patent, its infringements, and the infringements of its customers and end users based, at least, on service of R2 Solutions' Original Complaint in this action.

74.     When a user of the Deezer Music application uses the search functionality, that user directly infringes the '329 patent, including at least claims 8, 11, and 12, by controlling and obtaining beneficial use of the system, including servers and program instructions, provided by Deezer that performs the functionality described in Exhibit 3.

75.     Despite having knowledge (or being willfully blind to the fact) that use of the Deezer Music application infringes the '329 patent, Deezer has specifically intended, and continues to specifically intend, for persons (such as Deezer's United States customers) to access, purchase, exercise control over, benefit from, use, and/or otherwise interact with the Deezer Music application and its search functionality in ways that result in infringement of the '329 patent, including at least claims 8, 11, and 12. Indeed, Deezer knew or should have known that its actions have induced, and continue to induce, such infringements.

76.     Deezer instructs and encourages customers and end users to use the Deezer Music application in a manner than infringes the '329 patent. For example, the Deezer Music application prominently displays a search bar and/or icon to induce users to search for content:

21



Deezer Desktop App.

77.    Deezer further provides users of the Deezer Music application with instructions and operation tips (*see, e.g.*, https://support.deezer.com/hc/en-gb/articles/214151665-Search) that include instructions on how to use the search functionality in a way that results in infringement of the '329 patent.

**Damages**

78.    R2 Solutions has been damaged as a result of Deezer's infringing conduct described in this Count.  Deezer is, thus, liable to R2 Solutions in an amount that adequately compensates it for Deezer's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT IV
## <u>INFRINGEMENT OF U.S. PATENT NO. 8,209,317</u>

79.    R2 Solutions incorporates paragraphs 1–10, 14, 16–17, 32–34, and 39 herein by reference.

80.    This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq*.

81.    R2 Solutions is the owner of the '317 patent with all substantial rights to the '317 patent, including the exclusive right to enforce, sue, and recover damages for past and future infringements.

82.    The '317 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

### *Direct Infringement (35 U.S.C. § 271(a))*

83.    Deezer has directly infringed and continues to directly infringe one or more claims of the '317 patent in this District and elsewhere in Texas and the United States.

84.    To this end, Deezer has infringed and continues to infringe, either by itself or via an agent, at least claims 1–2, 8–10, and 12 of the '317 patent by, among other things, making, offering to sell, selling, testing and/or using the Deezer Music application.

85.    Attached hereto as Ex. 4, and incorporated herein by reference, is a representative claim chart detailing how Deezer infringes the '317 patent.

86.    Deezer is liable for its infringements of the '317 patent pursuant to 35 U.S.C. § 271.

### *Indirect Infringement (Inducement – 35 U.S.C. § 271(b))*

87.    In addition and/or in the alternative to its direct infringement, Deezer has indirectly infringed and continues to indirectly infringe one or more claims of the '317 patent by inducing direct infringement by its customers and end users.

23

88.    Deezer has knowledge of the '317 patent, its infringements, and the infringements of its customers and end users based, at least, on service of R2 Solutions' Original Complaint in this action.

89.    When a user of the Deezer Music application uses the search functionality, that user directly infringes the '317 patent, including at least claims 1 and 2, by controlling and obtaining beneficial use of the system, including servers and program instructions, provided by Deezer that performs the functionality described in Exhibit 4.

90.    Despite having knowledge (or being willfully blind to the fact) that use of the Deezer Music application infringes the '317 patent, Deezer has specifically intended, and continues to specifically intend, for persons (such as Deezer's United States customers) to access, purchase, exercise control over, benefit from, use, and/or otherwise interact with the Deezer Music application and its search functionality in ways that result in infringement of the '317 patent, including at least claims 1 and 2. Indeed, Deezer knew or should have known that its actions have induced, and continue to induce, such infringements.

91.    Deezer instructs and encourages customers and end users to use the Deezer Music application in a manner than infringes the '317 patent. For example, the Deezer Music application prominently displays a search bar and/or icon to induce users to search for content:



Deezer Desktop App.

92.     Deezer further provides users of the Deezer Systems with instructions and operation tips (*see, e.g.,* https://support.deezer.com/hc/en-gb/articles/214151665-Search) that include instructions on how to use the search functionality in a way that results in infringement of the '317 patent.

***Damages***

93.     R2 Solutions has been damaged as a result of Deezer's infringing conduct described in this Count.  Deezer is, thus, liable to R2 Solutions in an amount that adequately compensates it for Deezer's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**COUNT V**
**INFRINGEMENT OF U.S. PATENT NO. 9,928,279**

94.     R2 Solutions incorporates paragraphs 1–10, 15–17, and 35–39 herein by reference.

95.     This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq*.

96.     R2 Solutions is the owner of the '279 patent with all substantial rights to the '279 patent, including the exclusive right to enforce, sue, and recover damages for past and future infringements.

97.     The '279 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

*Direct Infringement (35 U.S.C. § 271(a))*

98.     Deezer has directly infringed and continues to directly infringe one or more claims of the '317 patent in this District and elsewhere in Texas and the United States.

99.     To this end, Deezer has infringed and continues to infringe, either by itself or via an agent, at least claims 1–3 and 7 of the '279 patent by, among other things, making, offering to sell, selling, testing and/or using the Deezer Music application.

100.    Attached hereto as Ex. 5, and incorporated herein by reference, is a representative claim chart detailing how Deezer infringes the '279 patent.

101.    Deezer is liable for its infringements of the '279 patent pursuant to 35 U.S.C. § 271.

*Indirect Infringement (Inducement – 35 U.S.C. § 271(b))*

102.    In addition and/or in the alternative to its direct infringement, Deezer has indirectly infringed and continues to indirectly infringe one or more claims of the '279 patent by inducing direct infringement by its customers and end users.

103.    Deezer has knowledge of the '279 patent, its infringements, and the infringements of its customers and end users based, at least, on service of R2 Solutions' Original Complaint in this action.

26

104.    When a user of the Deezer Music application uses the functionality described in Exhibit 5, that user directly infringes the '279 patent, including at least claims 2, 3, and 7, by controlling and obtaining beneficial use of the system, including servers and program instructions, provided by Deezer that performs the functionality described in Exhibit 5.

105.    Despite having knowledge (or being willfully blind to the fact) that use of the Deezer Music application infringes the '279 patent, Deezer has specifically intended, and continues to specifically intend, for persons (such as Deezer's United States customers) to access, purchase, exercise control over, benefit from, use, and/or otherwise interact with the Deezer Music application in ways that result in infringement of the '279 patent, including at least claims 2, 3, and 7. Indeed, Deezer knew or should have known that its actions have induced, and continue to induce, such infringements.

106.    Deezer instructs and encourages customers and end users to use the Deezer Music application in a manner than infringes the '279 patent. For example, the Deezer Music application prominently display user inputs to induce users to interact with content, collections, and/or the user interface, such as while content is streaming:



Deezer Desktop App.

107.    Deezer further provides users of the Deezer Music application with instructions and operation tips (*see, e.g.*, https://support.deezer.com/hc/en-gb/articles/360004367258-Exclude-an-artist-or-track-from-Deezer-recommendations) that include instructions on how to, e.g., interact with content, collections, and/or the user interface in a way that results in infringement of the '279 patent.

***Damages***

108.    R2 Solutions has been damaged as a result of Deezer's infringing conduct described in this Count.  Deezer is, thus, liable to R2 Solutions in an amount that adequately compensates it

for Deezer's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## DEMAND FOR A JURY TRIAL

R2 Solutions demands a trial by jury on all issues triable of right by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

R2 Solutions respectfully requests that this Court enter judgment in its favor and grant the following relief:

(i)    Judgment and Order that Deezer has directly and/or indirectly infringed one or more claims of each of the patents-in-suit;

(ii)   Judgment and Order that Deezer must pay R2 Solutions past and future damages under 35 U.S.C. § 284, including supplemental damages arising from any continuing, post-verdict infringement for the time between trial and entry of the final judgment, together with an accounting, as needed, as provided under 35 U.S.C. § 284;

(iii)  Judgment and Order that Deezer must pay R2 Solutions reasonable ongoing royalties on a go-forward basis after Final Judgment;

(iv)   Judgment and Order that Deezer must pay R2 Solutions pre-judgment and post-judgment interest on the damages award;

(v)    Judgment and Order that Deezer must pay R2 Solutions' costs;

(vi)   Judgment and Order that the Court find this case exceptional under the provisions of 35 U.S.C. § 285 and accordingly order Deezer to pay R2 Solutions' attorneys' fees; and

(vii)    Such other and further relief as the Court may deem just and proper.

**Dated: March 7, 2022**                              Respectfully submitted,


*/s/ Edward R. Nelson III*
**EDWARD R. NELSON III**
STATE BAR NO. 00797142
**BRENT N. BUMGARDNER**
STATE BAR NO. 00795272
**CHRISTOPHER G. GRANAGHAN**
STATE BAR NO. 24078585
**JOHN P. MURPHY**
STATE BAR NO. 24056024
**CARDER W. BROOKS**
STATE BAR NO. 24105536

**NELSON BUMGARDNER CONROY PC**
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
817.377.9111
ed@nelbum.com
brent@nelbum.com
chris@nelbum.com
murphy@nelbum.com
carder@nelbum.com

**COUNSEL FOR**
**PLAINTIFF R2 SOLUTIONS LLC**

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was electronically filed with the Clerk of Court using the CM/ECF filing system, which will generate and send an e-mail notification of said filing to all counsel of record, on this the 7th day of March, 2022.

*/s/ Edward R. Nelson III*